EMILY LOUISA VIVAR v. THE SUPREME LODGE OF KNIGHTS OF PYTHIAS.

52 455
59 253
54e 216
54e 416
52 455
f63 370
52 455
67 375

1. A member of a lodge in the Knights of Pythias was accused before his lodge of giving a false age upon entrance; the committee appointed to try him and report their opinion of his guilt or innocence, reported that they believed a false age had been given, and that a majority of the committee did not believe it had been given with any malicious intent or intent to defraud. *Held*, that this report did not convict the member of any offence, and that a vote of the lodge thereon, suspending the member for ninety-nine years, without any further hearing or any appeal, was unauthorized and void.

2. A grand lodge in the K. of P. has power to reverse the action of a subordinate lodge suspending one of its members, without the regular taking and prosecution of an appeal, and after the death of the suspended member.

3. The Endowment Rank of the Order of K. of P. is a voluntary mutual life insurance association, open to members of the order only, and under its constitution, when the action of a subordinate lodge suspending one of its members is reversed by the superior grand lodge, the

standing of the member in the Endowment Rank will be deemed in law to have always been the same as if no suspension had taken place.

4. A member of the Order of K. of P. actually suspended by his lodge is not subject to assessment in the Endowment Rank until his suspension is reversed, when he becomes bound to pay all assessments levied during his suspension.

5. In contracts of life insurance courts do not favor warranties by construction.

6. Statements.contained in an application for life insurance are of themselves mere representations, and, in order that they may have the force of warranties, they must not only be made part of the contract, but must also appear, on an examination of the entire contract, to have been deemed conditions upon the literal truth or fulfillment of which the validity of the insurance was intended to rest.

7. The known falsity of a representation made by an applicant for life insurance will not vitiate the contract of insurance, unless the representation was material to the contract or was deemed so by the insurer.

8. The fact that the representation was made in answer to a question put by the insurer, will ordinarily indicate that it was deemed material; but if, nevertheless, the terms of the contract show that it was not deemed material by the insurer, its known falsity will not vitiate the insurance.

9. An applicant for insurance in the Endowment Rank of the K. of P. was required to state, in his application, to whom he desired the sum insured to be paid and the relationship of the payee to himself; he responded, "To my wife, Emily Louisa Vivar." The contract bound the insurer to pay the sum insured "to Emily Louisa Vivar, his wife, as directed by said Brother in his application, or to such other person or persons as he may subsequently direct, by will or otherwise." *Held*, that the relationship of the payee was not material, and was not deemed material by the insurer, and that Emily Louisa Vivar could recover the sum insured, even though the applicant knew that she was not his lawful wife.

10. In the Endowment Rank of the Order of K. of P. the payees of insurance moneys are not confined to the relatives of the members.

11. When a person effects an insurance on his own life and in the policy designates another person as payee of the sum insured, the latter may maintain an action on the policy without showing an insurable interest in the life.

On contract.

Argued at February Term, 1890, before BEASLEY, CHIEF JUSTICE, and Justices SCUDDER, REED and DIXON.

For the rule, *E. Q. Keasbey.*

*Contra,* J. *T. Dunn* and *J. H. Backes.*

The opinion of the court was delivered by

DIXON, J. This suit was brought to recover the amount due on two certificates, in terms as follows:

"Certificate of membership. First class. $1,000. No. 6118. Endowment Rank of the Order of Knights of Pythias.

"This certifies that Brother Darius Vivar has received the Endowment Rank of the Order of Knights of Pythias in Section No. 311, and is a member in good standing in said Rank. And in consideration of the representations and declarations made in his application, bearing date of June 24, 1879, which application is made a part of this contract, and the payment of the prescribed admission fee, and in consideration of the payment hereafter to said Endowment Rank of all assessments as required, and the full compliance with all the laws governing this Rank, now in force or that may hereafter be enacted, and shall be in good standing under said laws, the said sum of one thousand dollars will be paid by the Supreme Lodge Knights of Pythias of the World, to Emily Louisa Vivar, his wife, as directed by said Brother in his application, or to such other person or persons as he may subsequently direct, by will or otherwise, and entered upon the records of the Supreme Master of Exchequer, upon due notice and proof of death and good standing in the Rank at time of death, and the surrender of this certificate; provided, however, that if at the time of the death of the said Brother Darius Vivar, there shall be less than one thousand members in this class, there shall only be paid a sum equal to one dollar for each member in good standing in this class. And it is understood and agreed, that any violation of the within mentioned conditions, or the requirements of the laws in force governing this Rank, shall render this certificate, and all claims, null and void,

and that the said Supreme Lodge shall not be liable for the above sum, or any part thereof.

"In witness whereof, we have hereunto subscribed our names and affixed the seal of the Supreme Lodge Knights of Pythias of the World.

"D. B. WOODRUFF,

"*Supreme Chancellor.*.

[L. S.]

" JOSEPH DOWDALL,

"*Supreme Keeper of Records and Seal.*

"Issued this 5th day of July, 1879," &c.

The other certificate is in the same form, but in the second class, for $2,000.

Darius Vivar died April 24th, 1882, and suit on these certificates was brought by Emily Louisa Vivar in July, 1888, on the trial of which action the learned justice directed a verdict for the plaintiff, and gave the defendant a rule to show cause why the verdict should not be set aside, which rule is now to be decided.

Of the grounds on which the defendant seeks to support the rule, the first to be considered is, that Darius Vivar was not in good standing in the rank at the time of his death.

The Supreme Lodge of the K. of P. is a corporation created in 1871 pursuant to the laws of the District of Columbia. By its constitution it is declared to be the source of all true and legitimate authority in the Order of K. of P. wheresoever established. Under it, in the various states and territories of the Union, are organized grand lodges, one of which is known as The Grand Lodge of K. of P. in the State of New Jersey. Subordinate to this grand lodge is, among others, the Olive Branch Lodge, of Elizabethport. Speaking generally, the supreme lodge consists of representatives from the various grand lodges, and each grand lodge is composed of certain past officers of its subordinate lodges. Membership in each subordinate lodge is derived from election therein. The Endowment Rank is a voluntary mutual life insurance association, open to members of the order only. It,

was established and is governed by the supreme lodge, and is divided into numerous local sections. Any member of a subordinate lodge desiring to enter the Endowment Rank joins such section of the rank as is most convenient.

Article IV. of the constitution of the rank provides that if a member of a section is suspended from his lodge for any cause, his membership in the rank ceases at the time of suspension from the lodge, but should the action of the lodge be reversed by higher authority, the standing of the member would be the same as if no action was had, and he must pay all assessments made during such suspension.

Upon this article the defendant contends, that Vivar was not in good standing in the rank when he died, and upon this article, also, does the plaintiff rely for her answer to the contention.

Article VI., section 2, of the constitution of Olive Branch Lodge, provides that each applicant for membership shall sign an application, stating his age, occupation and residence; and article IX. provides that every member violating any of the obligations, established principles, laws, rules or regulations of the order, disregarding the requirements of the constitution or by-laws, may be suspended from the lodge, in accordance with the laws, rules and regulations.

When Vivar joined the lodge, in June, 1879, he stated his age, in obedience to the second section of article VI., just mentioned. On September 7th, 1881, written charges were preferred against him before the lodge, as follows:

"Specification No. 1. Violation of the laws of this country.

"No. 2. For giving a false age upon entering the lodge.

"No. 3. For conduct unbecoming a knight."

Pursuant to other clauses of the constitution, these charges were referred to a committee of five knights for trial. Vivar appeared and was represented before them, and testimony was taken. On October 28th, 1881, the committee reported to the lodge that there was no evidence to support the first or third specification; that, as to the second, all the members of the committee believed that a false age had been given, and three

members of the committee did not believe that a false age was given with any malicious intent or intent to defraud. On November 9th, 1881, the report and the testimony were read before the lodge and the committee was discharged; then, motions that specification No. 2 be sustained, and that Vivar be suspended for ninety-nine years, were carried by a vote of nineteen to six.

Whether these proceedings were in substantial accordance with the constitution of Olive Branch Lodge, which is ordained by the grand lodge and not alterable by the subordinate lodge, may certainly be questioned. That constitution requires the committee to reduce their opinion as to the *guilt* or *innocence* of the accused to writing and present it to the lodge. If the report in Vivar's case complied with that provision, it seems to be properly construed as a finding in favor of his innocence, for the purport of the opinion of the majority is, that he had made an honest mistake as to his age, and certainly guilt cannot be predicated of such an error. The constitution directs that at the next stated meeting of the lodge after presentation of the report, it shall be considered by the lodge and a ballot be taken, when, a majority of the ballots cast being in favor of the report, it shall be recorded as the judgment of the lodge. There is no provision as to the procedure when a majority of the ballots cast are against the report. Under these circumstances, the vote of the lodge, on the question of sustaining the charge, should be deemed a vote to sustain only so far as the committee had reported in favor of it, and in that aspect it is difficult to see how it justified the infliction of any penalty. A penalty of practical expulsion from the order was certainly unreasonable. If now we turn to the by-laws of Olive Branch Lodge, which may supplement but cannot override its constitution, a similar conclusion will be reached. They provide that the trial committee " shall examine and determine the matter in question, and if no appeal be taken from the decision of the committee to the lodge, it shall be final as far as the guilt or innocence of the implicated brother is concerned, without other action from the lodge." In Vivar's case no appeal

was taken to the lodge, and, consequently, he should be regarded as exonerated from guilt, in accordance with the report of the majority of the committee. The vote to suspend him for ninety-nine years, in effect to expel him, without adjudging him guilty of any offence, was unlawful, beyond the authority of the lodge, and therefore void. A member of an association in which he has pecuniary rights cannot be expelled, unless he is found guilty of an offence which either affects the interests or good government of the association or is indictable by the law of the land. *Commonwealth* v. *St. Patrick's Society*, 2 *Binn.* 441. An attempted expulsion without a conviction had in accordance with the rules of the society or with the general principles of law, is nugatory, and the membership of the individual continues. *Innes* v. *Wylie*, 1 *Car. & K.* 257.

But, if it be conceded that the vote of the lodge did in fact suspend Vivar, the plaintiff, in reply, insists that the action of the lodge was " reversed by higher authority," and hence, according to article IV. of the constitution of the Endowment Rank, before quoted, the standing of Vivar as a member was the same as if no action had been taken against him.

By the constitution of the supreme lodge, grand lodges have (subject to a right of appeal to the supreme lodge) exclusive original jurisdiction over all subordinate lodges within their territorial limit and over the members attached to the same, and all power and authority, not reserved to the supreme lodge, is delegated to the grand lodges. By the constitution of the Grand Lodge of the State of New Jersey, approved by the supreme lodge, it has jurisdiction over all lodges within this state, and possesses the right and power of receiving and hearing all appeals, of redressing grievances and complaints arising in the lodges under its jurisdiction. According to that instrument, the committee on appeals and grievances shall hear all appeals and grievances from lodges or members of lodges referred to them by the grand lodge or grand chancellor, and report their decision to the grand lodge or to the grand chancellor during the recess. It also provides that every

member, considering that injustice has been done him by the decision of his subordinate lodge, may, within one month after such decision has been made, present to his subordinate lodge a written appeal therefrom, whereupon certain proceedings are to be taken by the member and the lodge to bring the appeal to a hearing, in default of which the appeal may be dismissed by the committee on appeals and grievances, to the disadvantage of the lodge or member not attending to the same.

According to the testimony in this suit, Vivar was sick at the time the vote passed for his suspension, in November, 1881, and so continued till his death, in April, 1882. Within thirty days after that vote he prepared an appeal and delivered it to one of the members of the trial committee, who was also president of that section of the Endowment Rank to which Vivar belonged. It does not appear that this appeal was prosecuted in conformity with the rules prescribed in the constitution. But at the session of the grand lodge held next after the death of Vivar, viz., on February 21st, 1883, the matter of Vivar's suspension was referred by the grand lodge to the committee on appeals and grievances, with power to investigate the same and report to the grand chancellor with their recommendations, and the grand chancellor was ordered to promulgate and enforce the same. On March 24th, 1883, the committee reported to the grand chancellor that they had thoroughly and carefully examined the matter, including the records of the lodge, the evidence taken at the trial, the report of the trial committee, and the action of the lodge, and that they were convinced that the charges against Vivar were illegal, that the notice to him was illegal, that his trial was illegal, that the conviction was not in accordance with the evidence, and that the punishment was not in accordance with the findings; that Vivar did not make false representations regarding his age, but plainly stated that he was not sure of it; and that although the law regulating appeals had not been complied with, it would be an act of gross injustice to enforce it in that case; and their judgment was, that at the

time of his death Vivar was in good standing in Olive Branch Lodge and also in the Endowment Rank, and entitled to all the benefits and privileges that could arise from his connection with said lodge and the Endowment Rank; and they recommended that the section should be notified of the action taken, and the lodge should be directed to make an immediate settlement with Vivar's widow. On April 5th, 1883, the grand chancellor notified Olive Branch Lodge that he approved of the report, whereby the action of the lodge in the case of Vivar was set aside, and directed it to pay to his widow the weekly benefits due him at the time of his death, and also the funeral benefits stipulated in its by-laws. With this direction the lodge complied. The section of the Endowment Rank was also notified, and thereupon made due requisition upon the proper officer of the Endowment Rank for payment of Vivar's insurance money. .

This action of the committee on appeals and grievances of the grand lodge, if valid, evidently reversed the action of the Olive Branch Lodge, and therefore placed the standing of Vivar in that lodge on the same footing, for all purposes of the Endowment Rank, as if no suspension had taken place.

Its validity is, however, disputed, first, upon the ground that the grand lodge and its committee had no power, except upon an appeal regularly taken and prosecuted. This position is not tenable. The prescriptions with regard to appeals are designed for the government of subordinate lodges and their members, but they are not limitations upon the authority of the grand lodge and its committee. This is manifested in the constitution of the supreme lodge, by which *original* jurisdiction over subordinate lodges and their members is conferred on the grand lodges, and all the power and authority of the order, not reserved to the supreme lodge, are delegated to them. It is also indicated by the constitution of the grand lodge of the state, which gives it the right and power, not only to hear appeals, but also to redress grievances and complaints arising in subordinate lodges, and which permits, but does not require, the committee on appeals and grievances to

dismiss appeals not regularly taken or prosecuted. Grievances may imperatively demand redress, even when appeals have not been taken, and it would work injustice, if there did not exist somewhere power to excuse non-compliance with these prescribed formalities; and clearly, in this order, that power belongs to the grand lodge.

The second ground, on which the validity of the action of this committee is denied, is, that Vivar being dead at the time, could not be restored to membership. But it was not required that he should be actually restored to membership; it was enough, in the words of the constitution of the Endowment Rank, if the " action of the subordinate lodge was reversed by higher authority." His death in no way prevented such a reversal. The rights to be impaired by that action survived him, and the persons in whom those rights vested were as really aggrieved thereby as he would have been, had he lived. Their grievance, arising in the Olive Branch Lodge, the grand lodge had power to redress. It is an every day occurrence to reverse judgments erroneously rendered against those who have since died, and although such a reversal cannot restore the *status* of the decedent in fact, it may do so in legal contemplation.

The last ground for denying the validity of this reversal is, that the grand lodge and its committee had no authority over the Endowment Rank. That they had no direct authority must be conceded. But, as already shown, they had direct authority over the action of Olive Branch Lodge in suspending Vivar, and could and did set it aside; thereupon, not by the mere authority of the committee, but by force of the constitution of the Endowment Rank, the case was as if no action to suspend Vivar had ever been taken, as if he had always stood well in his lodge, and, therefore, by this same constitution, he retained membership in the rank until his death, so far as it depended on his standing in the lodge.

We conclude that there was nothing in this aspect of the matter which impedes the plaintiff's recovery.

The defendant also denies Vivar's good standing in the Endowment Rank, for the reason that he did not pay the assessments made during his suspension.

There are two sufficient answers to this claim. One is, that Vivar was not notified of them, and the laws of the rank declare a member suspended only in case he neglects to pay within thirty days after notice. The other is, that under the proper construction of article IV. of the constitution of the rank, a member who has been suspended by action of his lodge is not required to pay assessments until that action is reversed.

In our opinion, Vivar must be considered to have been in good standing in the Endowment Rank at his death.

The next ground on which the defendant seeks a new trial is, that although Vivar, in his application for membership in the Endowment Rank, in response to the question, " State definitely to whom you wish the benefit made payable and relationship to you," had answered, " To my wife, Emily Louisa Vivar," and although by the certificates sued on the sums insured were made payable to " Emily Louisa Vivar, his wife," yet the trial judge rejected evidence offered by the defendant to show that, before and at the time of the plaintiff's marriage to Vivar, he had a lawful wife living, and both he and the plaintiff knew it, The defendant, while admitting that the plaintiff is the person intended by the contract, yet insists that her being Vivar's lawful wife was made a condition of the obligation, that as a part of the contract Vivar warranted the existence of such relationship.

By the terms of the certificates the application forms part of the contract; nevertheless, the statements contained in it are not necessarily, for that reason, warranties. In order to have the force of a warranty, the statement must indeed constitute part of the contract; but, whether even such a statement should be deemed a warranty, depends upon the just construction of the entire agreement. Courts do not favor warranties by construction, and hence parties will not be held to have entered into the contract of warranty, unless they clearly

appear to have intended it. If the contract refers to statements contained in another paper for some other purpose than to give them the force and effect of warranties—for instance, if it refers to them as "representations"—or if the purpose be doubtful, such reference will not convert the statements into warranties. Of themselves, statements in the application are mere representations, and they will not become conditions or warranties, unless the parties plainly evince an intention to make them such, either by so denominating them or by declaring the validity of the contract to depend upon their literal truth. *May Ins.*, §§ 158–165; *American Pop. Life Ins. Co.* v. *Day*, 10 *Vroom* 89. Even calling the statements warranties will not make them such, when other terms in the contract indicate a different understanding. *Fitch* v. *American Pop. Life Ins. Co.*, 59 *N. Y.* 557; *Anders* v. *Knights of Honor*, 22 *Vroom* 175.

Under these rules, the statements in the application now before us are not warranties. The certificates do not so designate them, but, on the contrary, style them "representations," and, in making them part of the contract, must be deemed to incorporate them as representations. Nor is there in the contract any provision to the effect that, if they be false or untrue or inaccurate, the insurance will be void. The clause at the end of the certificates, "that any violation of the within mentioned conditions   *   *   *   shall render the certificate, and all claims, null and void," must be understood as referring to matters which, by other parts of the contract, are made conditions, and cannot of itself create a condition out of what had been before mentioned as a representation only. The trial court therefore properly held, that the statement concerning the relationship between Vivar and the plaintiff was not a warranty.

It remains, however, to determine what effect it should have upon the contract if considered as a representation, untrue to the knowledge of the insured, for to that extent was the defendant's offer of proof.

In order to invalidate a contract, a representation made during the negotiations must not only be willfully untrue, but must also be material, or at least must appear to have been thought material by the party to whom it was made.   To quote the language of Prof. Parsons : " It is obvious that the fraud must be material to the contract or transaction which is to be avoided because of it, for if it relate to another matter, or to this only in a trivial or unimportant way, it affords no ground for the action of the court.   It must therefore relate distinctly and directly to this contract, and must affect its very essence and substance.   *   *   *   Nor can we give a better rule for deciding the question (whether the fraud be material or not) than this : If the fraud be such that, had it not been practiced, the contract would not have been made or the trans-action completed, then it is material to it; but if it be shown or made probable that the same thing would have been done by the parties in the same way, if the fraud had not been practiced, it cannot be deemed material." 2 *Pars. Cont.* 769. So, in *Anderson* v. *Fitzgerald,* 4 *H. L. Cas.* 484, Lords Cran-worth and St. Leonards both express the opinion, that a will-fully false representation made in obtaining a policy of life insurance will not vitiate the contract, unless it be material or be deemed material by the insurer, or the policy declare that the mere falsity of the statement shall avoid the insurance. A similar view was announced in *Valton* v. *The National Fund Life Assn.,* 20 *N. Y.* 32, and in many other cases cited in notes to *Carter* v. *Boehm,* 1 *Sm. Lead. Cas.* \*619, \*641.   Where the defence is, that a representation collateral to the contract was false and fraudulently made, the gist of the defence is the fraud of the plaintiff, by which the insurer was misled and induced to make the contract of insurance.   *Franklin Fire Ins. Co.* v. *Martin,* 11 *Vroom* 568, 573.   If the representation made, though known by the insured to be false, did not differ from the truth in any respect which was, either in fact or in the view of the insurer, material to the contract, then the falsehood did not mislead the insurer, or induce the contract, and should not be allowed to avoid it.

Usually the materiality of a representation will be inferred from the fact that it was made pending the negotiations, in response to a specific inquiry by the insurer; but this rule is not universal; for the purpose of the inquiry must be considered, to see whether the information is sought to aid the insurer in fixing the terms on which he will contract, or with an entirely different object. Thus, if a mutual insurance company should require its premiums to be paid within a definite time after the mailing of notice addressed to the residence of the insured, and with this rule in view should require every applicant for insurance to state his residence in his application, and an applicant should give as his residence, not the truth, but the place where he ordinarily received his mail, it would seem absurd to hold that such circumstance could invalidate the contract.

In the present case, the inquiry related merely to the payee of the money for which the insurer was to become responsible, and by the very terms of the contract subsequently made the insurer expressly left the designation of the payee to the absolute discretion of the insured, the language of the certificates being, that the supreme lodge will pay the sum insured to "Emily Louisa Vivar, his wife, as directed by said Brother [Vivar] in his application, or to such other person or persons as he may subsequently direct, by will or otherwise." A similar power is given to the insured by article IX. of the constitution of the rank. It seems manifest that a subject thus committed to the control of the insured was not material to the contract of the insurer, nor so regarded by the insurer, and that if Vivar had declared Emily Louisa Vivar to be not related to him, as the lodge now alleges the truth to have been, the contract would have been made on precisely the same terms as at present. While, therefore, the fact that the question was put might justify an inference that relationship between the payee and the member was thought material, yet the express terms of the certificates and the provisions of the constitution force the conclusion that it was not. In this respect the Endowment Rank of the Knights of Pythias,

differs from those benevolent societies which are organized for the benefit of members and their families solely, and with regard to which it has been properly held that the relationship of the payee is material. *Supreme Council American Legion of Honor* v. *Green*, 17 *Atl. Rep.* 1048; *American Legion of Honor* v. *Smith*, 18 *Stew. Eq.* 466.

. · The defendant further insists, that the relationship was made material by the legal necessity that the beneficiary should have an insurable interest in the life insured.

In New Jersey, the tendency of judicial opinion seems to be in favor of the proposition, that the assured need not have an interest in the life insured, in order to support the contract of insurance. *Trenton Mutual Life Ins. Co.* v. *Johnson*, 4 *Zab.* 576; *Martin* v. *Franklin Fire Ins. Co.*, 9 *Vroom* 140. Elsewhere, contracts of insurance without such an interest are generally condemned, as being contrary to public policy; yet, even in those jurisdictions, the ordinary rule appears to be, that when a person effects an insurance on his own life, and in the policy designates another person as payee of the sum insured, the latter may maintain an action on the policy without showing an insurable interest in the life. *Campbell* v. *New England Mutual Life Ins. Co.*, 98 *Mass.* 381; *May Ins.*, § 112. In view of the opinions heretofore expressed in this court, we should apply this rule to the present case, and hold that an insurable interest in the payee of these certificates was not requisite, and that, consequently, her relationship to Vivar did not become material on that ground.

Our conclusion is, that the relationship of Vivar to the plaintiff was not material to the contract, either in fact or in contemplation of the insurer, and that, therefore, the falsity of Vivar's statement regarding it could not invalidate the insurance.

The last reason urged for a new trial is, that Vivar, in his application, misstated his age. There was, however, no testimony produced at the trial which would warrant a finding to that effect.

· On the whole, we think that justice was done by the verdict, and that the rule to set it aside should be discharged.