GOLDSCHMIDT *et al. v.* MUTUAL LIFE INS. CO. OF NEW YORK.

(*Supreme Court, General Term, First Department.* December 29, 1890.)

ACTION ON LIFE INSURANCE POLICY—SUICIDE—EVIDENCE.

In an action on policies of life insurance, the defense being that the assured committed suicide, the evidence was that he was found dead in bed in his room, with the door locked; that some of those present, when the door was opened, noticed a strong smell of bitter almonds; that several hours later a police officer found, on a table near the bed, a small phial, and other bottles on the bureau; that, when the body was opened at the autopsy, a strong smell of bitter almonds was noticed by one witness, who testified, as an expert, that, in his opinion, death was caused by taking cyanide of potassium; and the coroner, who was not a physician, testified that the appearance was that death was from an unnatural cause, but he did not notice any odor. It was shown that deceased's estate was insolvent. Other testimony indicated that deceased, about the time he retired, had been smoking and reading; that he had made preparations for the next day, and there was nothing unusual in his appearance, or in that of the room; and that one of the plaintiffs, making a thorough search, found nothing that might have contained poison. *Held,* that there was no such preponderance of proof of suicide as to justify the direction of a verdict for defendant.

Appeal from circuit court, New York county.

Action by Adolph Goldschmidt, David Barach, and Daniel Goldschmidt against the Mutual Life Insurance Company of New York. Plaintiffs appeal from a judgment for defendant entered on a verdict directed by the court.

Argued before VAN BRUNT, P. J., and BARTLETT and BARRETT, JJ.

*Wilson & Wallis,* (*William G. Wilson,* of counsel,) for appellants. *Sewell & Pierce,* (*Robert Sewell,* of counsel,) for respondent.

BARTLETT, J. The plaintiffs sue as the assignees of two policies of insurance upon the life of Oscar Edler, who died on the 27th day of August, 1876. One policy contained a provision that it should be null and void if the person whose life was insured should die by his own act or hand, whether sane or insane; but in that event the company undertook to return the premiums paid. The other policy declared that the self-destruction of the insured person, whether voluntary or involuntary, and whether he was sane or insane at the time, was not a risk assumed by the company, but in such case the company agreed to pay the net reserve held upon the policy at the beginning of the year in which the death occurred. The defense, as presented upon the trial, was that Mr. Edler had committed suicide by taking poison, probably hydrocyanic acid. The defendant offered to allow judgment for an amount sufficient to cover the premiums paid on the first policy and the net reserve held on the second, but it contested any further liability. At the conclusion

of the evidence on both sides, the trial judge held that the defense had been made out, and that the recovery of the plaintiffs must be limited to the sum offered by the defendant, which was $250, with costs. The plaintiffs have appealed, and ask for a reversal of the judgment, on the ground that the facts proved did not warrant the inference of suicide, or at all events did not absolutely require such inference; and hence they contend that, if a verdict was to be directed at all, it should have been directed in their favor, or otherwise the question of suicide should have been left to the jury.

I am unable to agree with the learned counsel for the respondent that the evidence in this case would not support any other conclusion than that the deceased came to his death by his own voluntary act. It is true, there is little contradiction among the witnesses as to any material fact; but it seems to me that conflicting inferences may well be drawn by different minds from the uncontradicted proofs, and therefore that it was error to direct a verdict. It is tolerably clear that the deceased either died from natural causes or killed himself by taking poison. He was found dead in bed in his room at 6 o'clock in the morning. The door was locked on the inside, and was broken open by an officer who had been summoned by some of his friends. Precisely what led them to think there was any occasion to break into the room at that early hour is not stated, but there is a suggestion that it was because they had been unable to get in to deliver some letters or messages which had been brought to the house for the deceased the night before. Of those who were present when the door was thus opened only one person is called as a witness, —Mr. Emory H. Cahn. He says he went into the room and found Mr. Edler lying dead in bed, with a very calm expression upon his face, and all his clothes and surroundings in perfect order. He saw no bottles or phials or anything about the room which could have contained poison, but both he and a gentleman named Stillwell, who entered the room with him, noticed a pretty strong smell of bitter almonds as soon as they went in. This odor is relied upon by the defense as evidence of the presence of prussic acid in some form.

The only witness who testifies to seeing any phials in the room of the deceased is Bernard Lamb, a police officer, and this, not when the room was opened, but several hours later, between 9 and 10 o'clock in the morning. He states that at this time he found a small table at the right of the bed upon which there was a small phial; and also that there were several bottles upon the bureau. "I did not examine the bottles," he says. "I did not smell them. I took some of them up and looked at them to see what was in them. I can't say whether there was anything in any of them. There were inscriptions on some of the bottles. I did not notice what was on them. If I did, I don't recollect, it is so long ago. I did not secure the bottles as evidence for the coroner, but there was nothing touched until the coroner came." In the brief for the respondent, referring to the folio at which the testimony of this witness in relation to the phial is printed, we are told that at the right side of the bed there was a small table on which was a small, empty phial; but, according to the case, the officer did not say it was empty.

The coroner made an autopsy upon the body of Mr. Edler; and one Isaac Adler, who had been present at the autopsy, was called to testify in behalf of the defendant. He says he noticed nothing until the body was opened, but then he perceived a pretty strong smell of bitter almonds, such as is caused by hydrocyanic acid, and this odor increased in intensity as the heart and stomach were opened. His testimony does not distinctly indicate whether this witness is a physician, physiologist, or chemist, but he was questioned as an expert, and is spoken of in the brief of the appellants as a "medical man." He could not tell whether there was any hydrocyanic acid in the stomach, or what the result of the autopsy was, although he was satisfied from the smell alone that there was some form of hydrocyanic acid in the

stomach. After making these statements, the witness refreshed his memory by looking at a book which evidently related to his testimony before the coroner, and he was asked to tell what he then found to be the cause of death, in his opinion. He answered: "It was only an opinion, because I had no chemical analysis to go upon. By the appearance of the stomach,—the congestion of the coats of his stomach was such, and the smell of hydrocyanic acid to guide me,—my opinion was that he had taken cyanide of potassium into his stomach, and that caused his death."

The coroner who held the inquest was also examined as a witness for the defendant. He said the appearance was that the man had died from an unnatural cause, and a violent death. The witness was not a physician, however. At the autopsy he did not notice any odor. A chemist testified as to the character of hydrocyanic acid and its effects, and records from the public administrator's office were put in evidence to show that Mr. Edler's estate had turned out to be insolvent, and hence that his pecuniary condition furnished a motive for self-destruction.

So much for the evidence tending to sustain the inference of suicide. To my mind, it seems far from conclusive. Without the testimony as to the odor of bitter almonds, which is said to have been observed in the room when the door was opened, and subsequently at the autopsy, there would be no basis for this defense. It is plain that Mr. Adler, the witness who expressed the opinion that the deceased had taken cyanide of potassium, was influenced largely by the smell which he described. Furthermore, his declaration that, in the absence of an analysis, he had "only an opinion," suggests that this opinion may really have been little more than a guess. Such, at all events, is the impression left by his testimony, as I read it. Now, is the presence of the odor on the occasions which have been mentioned such absolutely convincing proof of poisoning as to preclude a jury from adopting any other view in reference to the cause of death? We think not. The sense of smell, in common experience, often proves anything but a trustworthy guide to the origin of particular odors. Then there is no evidence in the case at bar of the purchase or possession by the deceased of any kind of poison. The presence of bottles and phials in the room, as to the contents of which we know nothing, does not seem to me a very significant circumstance. No one would seriously argue that it is a necessary inference that a man has killed himself because there are bottles and phials in his locked bedroom, where he dies suddenly and alone, at night, happening at the time to owe more debts than he can pay. Something additional is needed to make out a case of suicide. The respondent points to the proof in regard to the characteristic odor of prussic acid poisoning, and insists that this is enough. The appellants urge that this evidence is far too meager to warrant the conclusion that the deceased died by his own hand; and they refer to the facts brought out in rebuttal as tending to show that death was due to natural causes. This testimony indicates that Mr. Edler had prepared a fresh, clean shirt to wear next day, by putting his buttons in it, and that he must have been smoking and reading about the time he retired, for upon the table near his bed lay the stump of a cigar, and a little book, with his glasses between the leaves. The witnesses say there was nothing unusual about the appearance of the apartment, except that its inmate lay there dead. One of them describes his face as very calm, as though he was asleep. The plaintiff Goldschmidt testifies that he was asked to look around the room and see whether he could find anything that might have contained poison, but he found nothing, although he made a pretty thorough search. While the defendant's view of this man's death may be the true one, it does not seem to me to be supported by such a preponderance of evidence as to warrant the withdrawal of the question from the consideration of a jury. The point that it ought to have been submitted to the jury is sufficiently raised by the exception which the plaintiffs took to the action of the

trial court in directing a verdict. *Trustees* v. *Kirk,* 68 N. Y. 459, 464. In my opinion, therefore, the judgment ought to be reversed, and a new trial ordered, with costs to the appellants to abide the event. All concur.