## INGERSOLL v. KNIGHTS OF GOLDEN RULE.

*(Circuit Court, S. D. Georgia, W. D. August, 1891.)*

1. INSURANCE—SUICIDE—PRESUMPTION OF ACCIDENTAL DEATH.
   In an action on a policy of insurance stipulating against liability if assured should commit suicide, whether sane or insane, where the evidence is conflicting and quite evenly balanced as to whether death was caused by the intentional or accidental act of deceased, it will be presumed that death resulted from accident.

2. SAME—CHANGE OF BENEFICIARY—INSURABLE INTEREST.
   Where the constitution of a mutual benefit insurance association and its policy provide that the beneficiary may be changed at the will of assured, the fact that the beneficiary has no pecuniary interest in the life insured does not render the contract void as against public policy.

At Law.

*Peabody, Brannan & Hatcher* and *Marion Erwin*, for plaintiff.
*A. A. Dozier* and *G. C. Chandler*, for defendant.

SPEER, J. W. J. Ingersoll brought suit in the city court of Columbus against the Knights of the Golden Rule, an insurance or benevolent association, chartered by the state of Kentucky, and carrying on its business in this state. The agency at Columbus is denominated "Castle Columbus No. 31," of which castle Charles A. Redd bears the title of "Commander," and performs the duty of agent. The suit is for $2,000, and $400 as accrued assessments, upon a certificate conferring the order of knight upon S. M. Ingersoll. The defendant thereby became liable upon the death of Ingersoll to pay his legal representative $2,000, with the accrued assessments. The declaration avers that S. M. Ingersoll in his life performed all the conditions of the policy, and, having taken out the same for the benefit of the plaintiff, W. J. Ingersoll, died on the 28th

day of August, 1889; and, although due proof of death has been made, the Knights of the Golden Rule have refused to pay the sum due the plaintiff, or any part thereof. The policy sued on contains the following proviso:

"If the comrade herein named should commit suicide, whether sane or insane, it shall render the certificate, and all claims under it, or upon the order, null and void, and the supreme commandery shall not be liable for the above sum, or any part thereof, except the accrued assessments."

By its plea the defendant tendered $241, which it insists is the sum of the accrued assessments, and by further plea insists that it is wholly relieved from liability upon the policy, for the alleged reason that the insured, S. M. Ingersoll, committed suicide. An additional plea denied that the plaintiff had an insurable interest in the life of the deceased, and that it was a wager policy.

The cause having been removed to this court, the issues were tried on the 5th day of November, 1890, and a verdict was rendered for the plaintiff for the sum of $2,241.41, and the costs of suit. A motion for new trial having been thereafter made, the following order was taken, the parties consenting thereto:

"It is ordered that the motion for new trial in above-stated case be granted upon the following terms agreed upon by counsel for plaintiff and defendant, to-wit: That the case be submitted for trial to the presiding judge without the intervention of a jury, upon the evidence already taken in said case, as agreed upon in the brief of evidence filed on the motion for a new trial, and that it be assigned for trial on June 3d next, peremptorily. In open court, May 25, 1891"—Signed by the judge presiding.

On the day named in the order the case was heard, and the presiding judge, having taken time for consideration, has reached a conclusion upon the following considerations:

With reference to the plea that the plaintiff, W. J. Ingersoll, had not an insurable interest in the life of S. M. Ingersoll, and that the certificate was issued as a wager policy, it is to be observed that they were brothers. The supreme court of the United States in the case of *Warnock* v. *Davis,* 104 U. S. 779, decision rendered by Mr. Justice FIELD, remarks as follows:

"It is not easy to define with precision what will in all cases constitute an insurable interest, so as to take the contract out of the class of wager policies. It may be stated generally, however, to be such an interest arising from the relation of the party obtaining the insurance, either as creditor of or surety for the assured, or from the ties of blood or marriage to him, as will justify a reasonable expectation of advantage or benefit from the continuance of his life. It is not necessary that the expectation of advantage or benefits should be always capable of pecuniary estimation; for a parent has an insurable interest in the life of his child, and the child in the life of his parent, a husband in the life of his wife, and a wife in the life of her husband. The natural affection in cases of this kind is considered as more powerful, as operating more efficaciously, to protect the life of the insured than any other consideration."

The nature of the relationship by blood or marriage sufficient to constitute the insurable interest has been much mooted. A step-son has been held to have no insurable interest in the life of his step-father, (*Society* v. *McDonald*, 122 Pa. St. 324, 15 Atl. Rep. 439;) and a grandchild not to have an insurable interest in the life of the grandfather, on account of relationship, (*Burton* v. *Insurance Co.*, Ind., 21 N. E. Rep. 746;) nor a son-in-law in a mother-in-law who has no visible means of support, and whom he keeps and maintains, (*Stambaugh* v. *Blake*, Pa., 15 Atl. Rep. 705;) and in the case of *Whitmore* v. *Supreme Lodge, etc.*, 100 Mo. 36, 13 S. W. Rep. 495, it was held, to give validity to a life insurance policy, the person who secures it must have a pecuniary interest in the life of the person assured. It does not, however, appear necessary to the existence of insurable interest in this case to rely upon the fact that S. M. Ingersoll and W. J. Ingersoll were brothers. The insurance was taken by S. M. Ingersoll himself on his own life for the benefit of his brother. This is clearly authorized. *Insurance Co.* v. *Schaefer*, 94 U. S. 460; *Insurance Co.* v. *France*, Id. 561. Besides, the insurance was had in a mutual benefit association. The policy provided that the beneficiary might be changed at the will of the insured. Article 8, § 15, of the constitution of the order, likewise provides for a change of the beneficiary; and, while it is true that a certificate was originally taken out for the benefit of the wife of S. M. Ingersoll, it was afterwards abandoned, and a new certificate issued in behalf of the plaintiff. It is observable that S. M. Ingersoll and his wife were living separately at the time of his death; and while this separation had been of short duration, and was no doubt entirely justifiable in the wife, it is not improbable that the domestic difficulties of the insured had occasioned the change in the person of the beneficiary. Be this as it may, in view of the character of the insurance, it was the legal right of S. M. Ingersoll to do so, whatever the motive may have been. The power of a member of a mutual benefit aid association to alter the rights of those declared by the charter to be beneficiaries is to be determined by its constitution and by-laws. *Sanger* v. *Rothschild*, 2 N. Y. Supp. 794. It is, moreover, true that, in cases of policies of insurance or benefit certificates issued by societies of this character, the beneficiary has no vested interest in the certificate until the death of the insured member. Up to this time the insured may change his designation of the beneficiary at will, and against the consent of such beneficiary. *Sabin* v. *Grand Lodge, etc.*, 8 N. Y. Supp. 185; *Supreme Conclave Royal Adelphia* v. *Cappella*, (Cir. Ct. E. D. Mich.) 41 Fed. Rep. 1. See, also, *Brown* v. *Grand Lodge*, (Iowa,) 45 N. W. Rep. 884; *Association* v. *Kirgin*, 28 Mo. App. 80. It is also true in associations of this character that the mere fact that the beneficiary has no pecuniary interest in the life insured does not render the contract void as against public policy. *Association* v. *Blue*, 120 Ill. 121, 11 N. E. Rep. 331; *Vivar* v. *Supreme Lodge, etc.*, (N. J.) 20 Atl. Rep. 36. See, also, *Johnson* v. *Supreme Lodge, etc.*, (Ark.) 13 S. W. Rep. 794; *Order of Mutual Companions* v. *Griest*, (Cal.) 18 Pac. Rep. 652;

*Knights of Honor* v. *Watson*, 15 Atl. Rep. 125; *Manning* v. *United Workmen*, 86 Ky. 136, 5 S. W. Rep. 385; *Byrne* v. *Casey*, 8 S. W. Rep. 38; *Schillinger* v. *Boes*, 85 Ky. 357, 3 S. W. Rep. 427; *Titsworth* v. *Titsworth*, (Kan.) 20 Pac. Rep. 213; *Milner* v. *Bowman*, (Ind.) 21 N. E. Rep. 1094.

On the issue of suicide by the insured presented by the defendant's plea, we feel obliged, after a careful analaysis of the evidence, to hold in favor of the plaintiff. The insured was a very intemperate man. He had been drinking heavily for some time before his death. He was also addicted to the use of opium. It appeared from the evidence that he had been in the habit of procuring at different times, from different persons, considerable quantities of laudanum. He had also been drinking for some time large quantities of blackberry wine. In fact, according to the testimony of several witnesses, this was his favorite beverage and stimulant. On the night before his death he purchased a bottle containing several ounces of laudanum. During the night he repaired to the residence of his mother-in-law, where his wife was living, and made several attempts to get in, but was defeated in his purpose. He was furnished, however, with bedding, and slept in the yard. The next morning very early he repaired to a bar-room, and with a man named Duke consumed a pint of whisky. He then returned to the house of his mother-in-law, and renewed his efforts to have an interview with his wife. The town marshal was sent for, and on his arrival this official, who it seems had much friendship for the deceased, requested him to go away with him. The deceased at once consented to do so, but after going a short distance said: "I have a bottle of wine in the bedding there; let me get it." No objection was made, and, having taken a bottle from the bed-clothes on the ground, the insured asked his friend to drink with him, which invitation was declined. Having been furnished with a tumbler, he poured a quantity of fluid from the bottle, and, after mixing it with water, drank it, and immediately exclaimed, "This is not wine; this is the genuine drink;" and, apparently feeling immediately the effect of the terrible quantity of poison he had taken, he exclaimed, "I want to die right here, in the presence of my wife and children;" and in a few moments was a corpse. It is true that in the night, during his efforts to see his wife, he threatened to kill himself, and, while there is much conflict of evidence about the important facts of the case, we have reached the conclusion that these threats were merely the vaporings of a drunken man, who was seeking to play upon the affection of his wife, and to compel her to return to his home. The truth appears to be that the unfortunate man, stupified by drink over night, and perhaps also by the effect of the laudanum he had taken, was rendered by his drinking in the early morning incapable for the time of distinguishing between the bottle of laudanum and the wine which by all the proof he had been drinking. The evidence showed the liquids to be of the same color. It is not likely that he would have invited his intimate friend to drink poison with him. The evidence, however, as to the motive and purpose of the insured, and as to the dispute whether the fatal act was intentional or accidental, is quite evenly balanced, and we

are largely controlled in this finding by the rule laid down by Mr. Justice HARLAN for the supreme court of the United States in the case of *Insurance Co.* v. *McConkey,* 127 U. S. 667, 8 Sup. Ct. Rep. 1360. The learned justice remarks:

"In respect to the issue as to suicide, the court instructed the jury that self-destruction was not to be presumed. In *Mallory* v. *Insurance Co.,* 47 N. Y. 52, 54, which was a suit upon an accident policy, it appeared that the death was caused either by accidental injury or by the suicidal act of the deceased. ·But,' the court properly said, ' the presumption is against the latter. It is contrary to the general conduct of mankind; it shows gross moral turpitude in a sane person.' Did the court err in saying to the jury that upon the issue as to suicide the law was for the plaintiff, unless that presumption was overcome by competent evidence? This question must be answered in the negative."

Upon a review of the evidence, made the more anxiously for the reason that the parties have thought proper to submit the case to the preceding presiding judge without the intervention of the jury, we find no legal reason to reach a conclusion different from that expressed in the verdict of the intelligent jury to whom on the first trial all the evidence was submitted. Judgment will be rendered accordingly.