THE UNITED STATES LIFE INSURANCE COMPANY

*v.*

WILLIAM VOCKE, Admr.

*Filed at Ottawa October 31, 1889.*

1. EVIDENCE—*coroner's inquisition—admissibility.* The coroner's inquest over a dead person is required by statute to be sealed up and returned to the clerk of the circuit court. It thus becomes a public record of the county, and, as such, it is competent evidence in another proceeding, tending to prove any matter properly before the coroner which appears on the face of the inquest. The court does not hold that such evidence is conclusive, but only that it is competent to be considered.

2. On the trial of an action brought on a policy of life insurance, which contained a clause that if the assured, within three years from the date thereof, should die by any act of self-destruction whatever, whether sane or insane, the defendant, under a proper plea, offered in evidence the coroner's inquest on the dead body of the assured, showing that the latter came to his death on, etc., by a pistol shot fired by his own hand, while laboring under a fit of temporary insanity, as tending to show the fact of suicide, which the court, on objection, excluded: *Held,* that the inquisition of the coroner was competent evidence, and the trial court erred in excluding it from the jury.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. KIRK HAWES, Judge, presiding.

This was assumpsit, originally brought by Elizabeth Kielgast, administratrix of the estate of Otto Wilhelm Kielgast, deceased, against the appellant, to recover upon a policy of life insurance on the life of the intestate. The policy was dated July 22, 1884, and contained, among other things, a condition that if, within three years of said date, the insured should die by any act of self-destruction, whether voluntary or involuntary, whether sane or insane, the contract of insurance should become null and void. The insured died January 17, 1885. The material facts appear in the opinion of the court.

Messrs. ISHAM, LINCOLN & BEALE, for the appellant:

The proofs presented by or on behalf of the plaintiff, operate, at the trial, as admissions against the plaintiff. Bliss on Life Insurance, (2d ed.) sec. 265; *Insurance Co.* v. *Watson,* 23 Mich. 486.

The certified copy of the verdict of the coroner's jury was admissible in evidence as a part of these proofs. Whether its effect as evidence might subsequently have been limited, or could properly have been limited by the court, is another matter. The paper itself was admissible in evidence. *Insurance Co.* v. *Newton,* 22 Wall. 32; *Newton* v. *Insurance Co.* 2 Dill. 154; *Insurance Co.* v. *Higginbotham,* 95 U. S. 380; *Lawrence* v. *Life Ins. Co.* 5 Bradw. 280; *Life Ins. Co.* v. *Lawrence,* 8 id. 488.

Inquisitions, generally, are admissible in evidence as a species of judicial records somewhat analogous to judgments *in rem.* They differ from judgments *in rem* in not being conclusive, since such judgments are, until set aside in a proper legal proceeding, binding against all the world. Inquisitions of a coroner stand upon an equal footing with others in respect to their admissibility in evidence. Starkie on Evidence, (10th Am. ed.) *404, *405; 2 Phillips on Evidence, (5th ed.) *262, *268; 1 Greenleaf on Evidence, sec. 556; 2 Taylor on Evidence, (6th ed.) sec. 1487.

Inquisitions of lunacy are admissible in evidence. *Banker* v. *Banker,* 63 N. Y. 409; 1 Wharton on Evidence, sec. 812; 2 Wharton on Evidence, sec. 1254; 2 Phillips on Evidence, (5th ed.) *266.

Inquests of office are admissible in evidence, and a coroner's inquest was, at common law, simply an inquest of office. *Rex* v. *Eriswell,* 3 T. R. 722; *Stokes* v. *Dawes,* 4 Mason, 268; Starkie on Evidence, (10th Am. ed.) *404; 3 Jacob's Law Dic. title "Inquests," p. 454.

The coroner's inquisition would have been *prima facie* proof that the insured committed suicide. *Association* v. *Palmer,*

25 Beav. 605; *Walther* v. *Life Ins. Co.* 65 Cal. 417; Jervis on Coroners, 318, *et seq;* 2 Stevens on Nisi Prius, 1642.

Mr. GEORGE F. WESTOVER, for the appellee:

The proceedings before the coroner were properly excluded from the jury, because they were no part of plaintiff's proof of death of the assured. The certified copy of the proceedings before the coroner was not voluntarily furnished the defendant by the plaintiff's attorney as part of the proofs of death, but was handed separately to the defendant's agent, twenty-one days after the proofs of death were served, and because the agent stated to the plaintiff's attorney that it would be required.

The verdict at the coroner's inquest could not bind plaintiff in this case. *Railway Co.* v. *McGrath,* 115 Ill. 172.

If the papers relating to the inquest had been attached to the original proofs, they could be introduced merely to show conformity to the requirements of the policy that proofs be served. *Lawrence* v. *Life Ins. Co.* 5 Bradw. 280; *Life Ins. Co.* v. *Lawrence,* 8 id. 488; Bliss on Life Insurance, 381.

The declarations of the plaintiff in the sworn proofs of death are admissible, but the contents of other documents not forming part of the proofs, not essential to show the death, even if delivered by her to the defendant, can be admitted in evidence for no purpose, for her or against her. *Insurance Co.* v. *Higginbotham,* 85 U. S. 380; *Cook* v. *Railroad Co.* 5 Lans. 401; *Cluff* v. *Life Ins. Co.* 99 Mass. 317.

In the one case, where the proceedings before the coroner were proper to be admitted on behalf of defendant, there were no proofs that the assured was dead except the coroner's verdict and affidavits attached thereto, and plaintiff testified that from an inspection of those proofs, defendant had admitted the assured to be dead. *Insurance Co.* v. *Newton,* 22 Wall. 32.

In this case there was considerable testimony tending to show the manner of the death of the assured, and the jury

found he died by an accident.   The matter was fairly sub-
mitted to the jury, and there are no objections urged against
the instructions.   *Keels* v. *Life Association,* 29 Fed. Rep. 198.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was an action brought by Elizabeth Kielgast, admin-
istratrix of the estate of Otto Wilhelm Kielgast, against the
United States Life Insurance Company of the city of New
York, to recover the amount of a policy issued by the com-
pany to the deceased on the 22d day of July, 1884.   To the
declaration the defendant pleaded the general issue, and also
filed one special plea, in which it set up that the policy of
insurance contained a provision, that if, within three years
from the date of the policy, the insured should die by any act
of self-destruction whatever, the policy should become null
and void, and that the insured, Otto Wilhelm Kielgast, did die
by an act of self-destruction, to-wit, by shooting himself with
a pistol, by means whereof the policy of insurance became void.

It appears that a coroner's inquest was held over the body
of the deceased by the coroner of Cook county and a jury, and
in making proofs of death a certified copy of the record of the
coroner's inquest, consisting of the inquisition and the depo-
sition of three witnesses, was returned to the insurance com-
pany as a part of the proofs of death.   The inquisition shows
on its face that Kielgast came to his death on the 17th day of
January, 1885; that the death was caused by a pistol shot
fired by the hand of the deceased while laboring under a fit of
temporary insanity.   On the trial the defendant offered in
evidence the certified copy of the inquisition, which had been
returned to defendant as a part of the proofs of death.   The
court excluded the evidence.   The defendant then offered in
evidence the original papers of which those previously offered
were copies, offering the entire set of papers together, includ-
ing the verdict and testimony.   This evidence was also ex-

cluded.   The defendant excepted to the decision of the court in excluding the evidence so offered, and the determination of the ruling of the court on the evidence is the principal question presented by the record.   The inquisition was as follows:

"STATE OF ILLINOIS, ⎫
    *County of Cook.*   ⎬ *ss.*

"An inquisition was taken for the People of the State of Illinois, at 38 Grant Place, in the city of Chicago, in said county of Cook, on the 18th day of January, A. D. 1885, before me, Henry L. Hertz, coroner in and for said county, upon view of the body of Otto W. Kielgast, then and there lying dead, upon the oaths of six good and lawful men of the said county, who, being duly sworn to inquire, on the part of the People of the State of Illinois, into all the circumstances attending the death of the said Otto W. Kielgast, and by whom the same was produced, and in what manner and when and where the said Otto W. Kielgast came to his death, do say, upon their oaths as aforesaid, that the said Otto W. Kielgast, now lying dead at 38 Grant Place, in said city of Chicago, county of Cook, State of Illinois, came to his death on the 17th day of January, A. D. 1885; and we, the jury, find that O. W. Kielgast came to his death on the night of January 17, 1885, by a pistol shot fired by his own hand, while laboring under a fit of temporary insanity.

"In testimony whereof, said coroner and the jury of this inquest have hereunto set their hands the day and year aforesaid.

DOUGLAS BARSTOW, *Foreman,*    LOUIS GASSELIN,
O. W. HAYNIE,                             H. M. GILLETTE,
ANGELO FAIEL,                           M. J. SHUTE.
                              HENRY L. HERTZ, *Coroner.*
                                    P. KNOFF, *Deputy.*"

Among the depositions was one given by appellee, as follows:

"The deceased is my husband; he was thirty-nine years of age, and was born in Germany; insurance agent by occupa-

36—129 ILL.

tion. On the evening of January 17, about nine o'clock, P. M., I heard a shot fired in his room; we hollered, and went down stairs, and sent my hired girl for the police. When he came we went upstairs, where we found the deceased dead. All of a week ago he said he would kill himself,—that was, every day for the last six days. On the evening of January 17th, when he arrived home, he kissed his little boy, and said, 'Charlie, this is the last kiss that you will give your father.' For the last week he was drinking more than usual.

her
ELIZABETH X KIELGAST."
mark.

We shall not stop to inquire whether the court erred in excluding the offered evidence as a part of the proofs of death, but we will proceed at once to determine the question whether the inquisition was competent evidence for the defendant, under its special plea, tending to prove that Kielgast came to his death by his own hand.

The office of coroner, at the common law, is an ancient one, —so much so, that Jarvis on Coroners, page 2, says that the office of coroner is of so great antiquity that its commencement is not known. In Bacon's Abridgment (vol. 2, p. 428,) it is said: "The powers and duties of a coroner are, by the common law, both judicial and ministerial. His judicial authority relates to inquiries into the cases of sudden death, with the aid of a jury, *super visum corporis*, where the death has happened." And Blackstone says, (1 Blackstone's Com. *348): "The office and power of a coroner are also, like those of a sheriff, either judicial or ministerial, but principally judicial. This is in great measure ascertained by statute 4 Edw. I, *de officio coronatoris*, and consists, first, in inquiring, when any person is slain, or dies suddenly, or in prison, concerning the manner of his death. And this must be *super visum corporis*, for if the body be not found the coroner can not sit."

In *Giles* v. *Brown,* 1 Mills' Court Rep. (7 S. C. 230,) it is said: "Coroners are very ancient officers at the common law.

\*   \*   \*   In England they were chosen by the freeholders of the county,   \*   \*   \*   and their powers, when appointed, are either judicial or ministerial.   The judicial power of a coroner is, first, to inquire into or concerning the death of a man, when one is slain or dies suddenly, by a jury of inquest, *super visum corporis*, and this must be done at the place where the death happened; and if any one be found guilty, by this inquest, of murder or other homicide, he is to commit him to prison for further trial.   They are also to make inquiry   \*   \*   \* of all things which occasioned it, after which it is his duty to certify the whole of this inquisition under his seal and the seals of the jurors, together with the evidence therein, to the Court of King's Bench or the next assizes."

The earliest English statute relating to coroners was passed in the fourth year of Edward I, and it is said by Jarvis on Coroners, 29, that it was merely directory, and in affirmance of the common law.   The first act of the legislature of this State regulating the duties of coroners was passed March 2, 1819. The next statute was passed January 20, 1821.   (Laws of 1821, p. 22.)   This act, upon an examination, will be found to be substantially like the statute of 4 Edw. I.   Our present statute does not differ materially from the earlier acts.   Indeed, coroners are now required to proceed substantially as at common law, and as required by the statute of 4 Edw. I.   Under section 9 of our present statute relating to coroners, they are made conservators of the peace in their respective counties. Section 13 makes it the duty of the coroner, upon information that the dead body of any person is found or lying within the county, supposed to have come to his death by violence or any undue means, to repair to the place where the dead body is, and take charge of the same, and summon a jury of six lawful men of the neighborhood to assemble where the body is, and, upon a view of the body, to inquire into the cause and manner of the death.   Section 17 makes it the duty of the jury, after being sworn, to inquire how, in what manner, and by whom or

what, the said dead body came to its death, and of all other facts of and concerning the same, together with all material circumstances in any wise related to or connected with the said death, and make up and sign a verdict and deliver the same to the coroner.   Sections 19 and 20 are as follows:

"Sec. 19.  If the evidence of any witness shall implicate any person as the unlawful slayer of the person over whom the said inquisition shall be held, the coroner shall recognize such witness, in such sum as he may think proper, to be and appear at the next term of the circuit court for the said county, there to give evidence of the matter in question, and not depart without leave, except that in the county of Cook the recognizance shall be to the Criminal Court of Cook county.

"Sec. 20.  If any witness shall refuse to enter into such recognizance, it shall be the duty of the coroner to commit the witness so refusing to the common jail of the county, there to remain until the next term of the said court; and the coroner shall carefully seal up and return to the clerk of the court the verdict of the jury, and the recognizances, and it shall be the duty of the clerk to carefully file and preserve the same."

Section 21 requires the coroner to reduce to writing the testimony of each witness examined at the inquest, which testimony shall be filed by the coroner in his office and preserved. Section 22 provides that the coroner shall keep a record of each inquest.  Section 26 provides that if a person implicated by the inquest is not in custody, the coroner shall apprehend and commit such person to the jail of the county, there to remain until discharged by due course of law.

The foregoing are the principal sections of the statute which relate to the inquest of the coroner, and, from the nature and character of the proceeding as it has been recognized by courts and law writers, we must determine whether a coroner's inquisition should be used as evidence in a case of this character.   It will be observed that the evidence of all witnesses examined before the coroner is required to remain in his office,

while the inquest must be sealed up and returned to the clerk of the circuit court of the county, where it shall be filed. Thus the inquest becomes, by force of the statute, a record of the circuit court,—a public record of the county where the inquest is held. It is a record containing the results of a public inquiry, made by a public officer under authority of law, relating to matters in which the public have an interest. Shall it be held that a public record of this character shall not be evidence, in a judicial proceeding, tending to prove the facts found to be true on the face of such record? We are not prepared to adopt a rule of that kind; moreover, we believe the weight of authority to be in favor of the admission of such evidence.

Starkie (vol. 1, p. 258,) seems to lay down the rule that an inquisition is admissible in evidence. He says: "In *Sergeoron* v. *Sealy*, 2 Atk. 412, Lord HARDWICKE said that inquisitions of lunacy, inquisitions *post mortem*, and others, were always admissible, though not conclusive. In the case of *Burridge* v. *Earl of Essex*, 2 Ld. Raym. 1292, an inquisition *post mortem* setting out the tenor of a deed, was held to be evidence of the deed."

Greenleaf, (vol. 1, sec. 556,) in speaking of inquisitions, says: "These are the result of inquiries, made under competent public authority, to ascertain matters of public interest and concern. They are said to be analogous to proceedings *in rem*,—being made in behalf of the public,—and that therefore no one can strictly be said to be a stranger to them. But the principle of their admissibility in evidence between private persons seems to be, that they are matters of public and general interest, and therefore within some of the exceptions to the general rule in regard to hearsay evidence. * * * The general rule in regard to these documents is, that they are admissible in evidence, but that they are not conclusive, except against the parties immediately concerned and their privies." See, also, 2 Phillips on Evidence, (5th ed.) 262, and 2 Taylor

on Evidence, (6th ed.) sec. 1487, where the same doctrine is announced.

In *The People* v. *Devine*, 44 Cal. 452, the question arose whether the evidence of a witness taken before the coroner could be used to contradict the evidence of the same witness subsequently given on a trial in court. In considering the question it is said: "The testimony had been returned into court as part of certain proceedings, judicial in their character, had before an officer appointed by law and expressly charged with the duty of reducing, or causing it to be reduced, to writing, and returning it into court. At common law, as well as under the statute of Edward I and our statute concerning coroners, which are but declaratory of the common law, the coroner holding an inquest *super visum corporis* is in the performance of functions judicial in their character, (*R.* v. *White*, 3 E. & E. R. 144; Rep. Const. Ct. So. Ca. 231; 32 Missouri R. 375,)—so distinctly judicial that he is protected under the principles which protect judicial officers from responsibility in a civil action brought by a private person. (*Garnett* v. *Farrand*, 6 Barn. & Cress. 611.) Whether his proceedings be entered upon the coroner's roll at common law and the statute of Edward, or returned into court under our own statute, they amount to entries concerning matters of public interest, made under the sanction of an official oath, and in compliance, or presumed compliance, with the requirements of law. In our investigations we have not found any authority in text-books or adjudicated cases which distinguishes between these and any other official proceedings taken and returned in the discharge of official duty, as to their admissibility in evidence upon the principle referred to." See, also, *Fielder* v. *Silk*, 3 Campb. 126, and *Silas* v. *Brown*, 38 E. C. L. 601.

The citation of other authorities would seem to be unnecessary. We are satisfied, both upon principle and authority, that the coroner's inquisition was admissible in evidence. The inquisition was made by a public officer, acting under the

sanction of an official oath, in the discharge of a public duty enjoined upon him by the law, and when it is returned into court, and is filed, we see no reason why it should not be competent evidence tending to prove any matter properly before the coroner which appears upon the face of the inquisition. We do not hold that such evidence is conclusive, but only that it is competent evidence to be considered.

Reliance is placed by the plaintiff on *Pittsburg, Cincinnati and St. Louis Railway Co.* v. *McGrath*, 115 Ill. 172, as an authority sustaining the ruling of the trial court. That was an action brought against the railway company to recover damages for the killing of plaintiff's intestate, and on the trial the court excluded the deposition of a witness taken before the coroner. That ruling was approved; but whether a coroner's inquisition was admissible in evidence was not raised nor was it decided, and hence the decision cited and relied upon has no bearing whatever on the question presented by this record.

We are of the opinion that the court erred in excluding the inquisition, and for that reason the judgments of the Appellate and Superior courts will be reversed, and the cause remanded to the Superior Court for another trial.

*Judgment reversed.*

Mr. JUSTICE BAILEY, having heard this case in the Appellate Court, took no part in its decision here.

Separate opinion by Mr. JUSTICE BAKER:

I concur in the view of the case taken in the opinion of Mr. Justice CRAIG. The Appellate Court evidently misapprehended the scope and effect of the decision of this court in *Pittsburg, Cincinnati and St. Louis Railway Co.* v. *McGrath*, 115 Ill. 172. That case is authority to sustain the action of the Superior Court in excluding from the jury the depositions taken at the coroner's inquest, but not to justify the ruling against the admission in evidence of the inquisition itself,—that is, the verdict of the jury,—as independent evidence of suicide. In fact,

no question in regard to the inquisition arose in that case. The courts below were probably misled by the inadvertent use in one place, in the opinion, of the word "inquisition," instead of the word "deposition" or "testimony." It is apparent, from the context, that one or the other of these latter words was intended, for otherwise the expression is inaccurate.

At common law, and in this State until the adoption of the constitution of 1848, a coroner and his jury holding an inquest *post mortem* constituted a court with judicial powers. Our present statute in regard to coroners is substantially a re-enactment of the statute of 4 Edward I, and that was held to be merely in affirmance of the common law. In early days, the finding of the coroner and his jury was regarded as a judicial determination of a very absolute and binding character, and my Lord COKE considered an inquisition of *felo de se*, taken by the coroner, *super visum corporis*, to be conclusive evidence of the fact against the executors or administrators of the deceased. Through the influence of Lord HALE, the doctrine was modified to the extent it was settled such inquisition might be traversed, he conceiving it unreasonable that the executors or administrators should be concluded by an inquisition which might be taken by the coroner behind their backs, without an opportunity afforded them to make answer.

The rule which now obtains, as appears from the text-books, and also, almost without exception, from the decided cases, is that inquisitions *post mortem* are admissible in evidence, but are not conclusive. The general doctrine, as stated in 1 Greenleaf on Evidence, (sec. 556,) is, that these inquisitions are within the exceptions to the rule in regard to hearsay evidence, and are distinguished from other hearsay evidence in having peculiar guarantees for their accuracy, and are the results of inquiries, made under competent public authority, to ascertain matters of public interest and concern, and that no one can be considered a stranger to them. The only difficulty in respect to the admissibility in evidence of the inquisition itself, is found in

the fact that section 1 of article 6 of the constitution of 1870 provides that "the judicial powers, except as in this article is otherwise provided, shall be vested in one Supreme Court, circuit courts, county courts, justices of the peace, police magistrates, and in such courts as may be created by law in and for cities and incorporated towns." Said article 6 disposes of all the judicial power of the State, and completely exhausts the subject, and a coroner's inquest is not provided for therein. So it is certain that in this State, and under its present constitution, the coroner and his jury do not constitute a court, and are not clothed with judicial powers, as was the case at common law.

The inquisition not being the result of a judicial proceeding, is the old common law rule of evidence, that it is competent testimony, thereby abrogated? I think not, and am of opinion that common law principles and the analogies of the law, and the decisions of this court, justify such conclusion. The provision found in section 1 of article 5 of the constitution of 1848 was substantially that contained in the present constitution. An act of March 3, 1845, made provision for an inquiry before a sheriff and a jury, into the right of parties claiming property on which the sheriff had levied an execution. In *Rowe* v. *Bowen*, 28 Ill. 116, the point was made that this inquest or trial of the right of property, created by the statute for the purpose of enabling the sheriff to interpose the verdict of a jury as his justification for selling the property or restoring it to the claimant, as the verdict might direct, had been abolished by the constitution of 1848. The court held otherwise, and that said law was in no respect in derogation of the constitution. It was held that the verdict of a jury, under this statute, afforded a complete indemnity to the sheriff, and it was there said: "In the inquiry or inquest the sheriff decides nothing, nor does he, nor does the jury, pronounce any judgment. The jury sign and render a verdict only, and to the effect that from the facts before them the property, *prima*

*facie,* belongs to the claimant, or to the defendant in the execution, as the case may be, so far as the writ is concerned." Of course, under this decision, the verdict of the jury found at the sheriff's inquest would have been admissible as testimony in favor of the sheriff in suit brought by the claimant for selling the property, or in suit brought by the execution creditor for abandoning the levy, or against the sheriff in suit prosecuted by the claimant for selling after a verdict in his (the claimant's) favor.

In *Andrews* v. *The People,* 75 Ill. 605, it was held that the act of 1873, making the collector's return in writing and under oath to the sheriff or county treasurer, of the taxes levied by a town or city, due and unpaid, *prima facie* evidence that all the requirements of the law had been complied with in the assessing and levying of the taxes therein returned as unpaid, and that said taxes were due and unpaid, is not liable to the constitutional objection that it gives the collector judicial power to determine the question of delinquency, since the report is only made *prima facie* evidence of that fact.

In *Spencer et al.* v. *The People,* 68 Ill. 513, *Porter* v. *Rockford, Rock Island and St. Louis Railroad Co.* 76 id. 561, *East St. Louis Connecting Railway Co.* v. *The People,* 119 id. 182, *St. Louis Bridge and Tunnel Railroad Co.* v. *The People,* 127 id. 627, and in numerous other cases, this court has held that the valuation for taxation of certain kinds of property is, by the statute, committed to the State Board of Equalization, and that its decision is judicial in its nature, and can only be assailed for fraud or want of jurisdiction. So, also, at common law, inquisitions of lunacy and inquests of office are admissible in evidence, and it is not understood that the provision of our State constitution in question has rendered them incompetent as testimony. Moreover, under our statutes, the findings, reports or schedules of various commissioners, boards and officers are either made competent evidence or *prima facie* evidence in express terms, or are given the legal effect of evi-

dence. See section 145, chapter 24, of the Revised Statutes of 1874, in respect to commissioners appointed to make special assessments; section 8 of the Extortion and Unjust Discrimination act, in respect to schedules made by the Railroad and Warehouse Commissioners; section 11, chapter 2, in regard to auditors, in actions of account; the provisions of chapter 10, with reference to the awards of arbitrators; the provisions of chapter 41, in regard to commissioners, to assign dower; the provisions of chapter 106, in regard to commissioners, to make partition; and various other statutory provisions of like character, too numerous to specify.

My conclusion is, that while, under the constitution, the coroner and coroner's jury no longer compose a court with judicial powers, yet the inquisition or verdict made by them, and which is required to be returned to and filed in the office of the clerk of the circuit court, and which thereby becomes a record of that court, is competent testimony, and that the ruling of the trial court in the case at bar, refusing to admit in evidence the verdict of the coroner's jury which inquired into the matter of the death of Otto Wilhelm Kielgast, deceased, was erroneous, and I concur in the conclusion that for that error the judgment should be reversed, and the cause remanded to the Superior Court for another trial.