## WASEY v. TRAVELERS' INSURANCE CO.

1. LIFE INSURANCE—CAUSE OF DEATH—SUICIDE.

Where there was evidence, in an action on a life-insurance policy, that the insured, who at the time of his death was under treatment at a sanitarium for a form of mental disease usually accompanied by suicidal tendencies, was possessed of a strong desire to escape from his confinement, the jury was warranted in finding that his action in jumping into a river, in which his body was found soon after he was missed by a companion, was impelled by a desire to escape by swimming, and not by a purpose to suicide.

2. EVIDENCE—EXCLUSION—FACTS PROVED—HARMLESS ERROR.

The exclusion of evidence designed to establish a fact sufficiently shown by the uncontradicted testimony in the case is harmless error.

3. LIFE INSURANCE — CAUSE OF DEATH — ADMISSIONS AGAINST INTEREST.

In an action on a life-insurance policy, where the beneficiary claimed that the insured came to his death by accidental drowning, evidence that she had stated in the proofs of loss furnished to another company that the insured committed suicide, and that she filed with defendant a physician's affidavit giving suicide as the cause of death, was competent to be considered by the jury as admissions against her interest, though she was not shown to have had any personal knowledge of the facts.

4. SAME—HEARSAY.

But a statement in the physician's affidavit that a coroner's inquest had established the fact that death was the result of suicide was inadmissible as hearsay. MONTGOMERY, C. J., and HOOKER, J., dissenting.

5. SAME—CORONER'S VERDICT.

A verdict of a coroner's jury, that one whose life was insured committed suicide, is not admissible as original evidence against the beneficiary of the fact that he committed suicide.

6. SAME — PRESUMPTIONS AGAINST SUICIDE — INSANITY — INSTRUCTIONS.

Where the defense of suicide was interposed to an action on a life-insurance policy, and the uncontradicted testimony showed that the insured was suffering from a species of insanity usually attended with suicidal tendencies, a charge that the presumption of law was that he did not commit suicide, whether sane or insane, was erroneous; no presumption being properly indulged under such circumstances.

Error to Wayne; Waite, J. Submitted October 5, 1900. Decided March 26, 1901.

*Assumpsit* by Anna B. Wasey against the Travelers' Insurance Company on a policy of insurance. From a judgment for plaintiff, defendant brings error. Reversed.

*Edwin F. Conely* and *Orla B. Taylor*, for appellant.

*Harlow P. Davock* (*Otto Kirchner*, of counsel), for appellee.

MONTGOMERY, C. J.   The defendant insurance company issued, upon the life of George E. Wasey, a policy of insurance, payable to the plaintiff herein, for the sum of $12,000, in monthly installments of $50 each.   The policy was subject to the condition that in case of suicide committed by Mr. Wasey, while sane or insane, within two years from the date of the policy, the limit of recovery thereunder should be the premiums paid thereon.   It was issued upon the 23d day of February, 1897.   Only one annual premium, of $232.44, had been paid, when Mr. Wasey died.   On the 2d day of November, 1897, Mr. Wasey came to his death by drowning in the Flint river, at Flint, in this State.   On the trial in the court below the plaintiff contended that the drowning of Mr. Wasey was accidental.   The defendant contended that it was intentional and suicidal.   This was practically the sole issue in the court below.   The jury found for the plaintiff for all the $50 installments past due at the date of the verdict. The defendant submitted to the jury the following question: "Did George E. Wasey commit suicide?"   They answered it, "No."

At the time of Mr. Wasey's death he was, and ever since the previous July he had been, a patient at the Flint sanitarium.   Mr. Wasey was suffering from *melancholia agitata*.   The evidence shows that this disease is often accompanied by a suicidal impulse, and the statements made by Mr. Wasey to his wife while at Flint indicate that he had, before entering that institution, entertained the idea of killing himself, but he at the same time stated that he had not entertained such a thought while at Flint, and asked his wife's forgiveness for having thought of such a thing on the earlier occasion.   There was testimony tending to show that Mr. Wasey was under a strong impulse to make his escape from the sanitarium.   The manner of his death, briefly told, was as follows:   He went for a drive with his friend and former pastor, Rev. Mr. Washburn.   They entered the cemetery bounded by the Flint river.   Mr. Washburn, having left his horse

unhitched at a distance of some 10 or 12 rods away from the point to which they had walked, suggested that they return. Mr. Washburn describes what then occurred as follows:

"He says, 'You go back and get the horse, and I will be here when you return.' I went back for the horse. I did not turn to look to see where he was. * * * It is quite easy walking from that point over to the horse, so that I would not be delayed. There is a driveway. I walked at just an ordinary gait. I immediately took the horse, and turned him around. There was no interval of delay. I drove then to the point where Mr. Wasey said he would be,—where I would find him. That was where I left him,—about a rod away from where I left him. When I reached there I did not see him. After a time I called for him, and received no response. I then went about some. On the north side of the cemetery is a ridge that commands all the view. I drove up on that ridge, and drove all about the cemetery, in search of him. I did not see him. * * * It would be hard to judge exactly how long I had been away from him until I returned to the place where I had left him. It does not seem to me it could be over five minutes; it might have been. I would not think it was over five minutes. From the place where the miniature house stands on the little girl's grave, to the best of my knowledge, I think you cannot see the river. The river is visible from parts of the cemetery. The distance from the cemetery to the river varies. I should think at some points it was 100 rods; other places, perhaps not more than 50, as the river curves. I am not very accurate in my estimate of distances. It is an open country between the cemetery and the river after you leave the cemetery fence, —the cemetery borders. There are trees and shrubbery on the borders of the cemetery. Between it and the river there are none. It is entirely open for a mile and a quarter or so."

A search was very soon instituted, and it was found that Mr. Wasey had laid aside his overcoat at the bank of the river, and his body was soon after found in the stream.

1. It was the defendant's contention that the evidence conclusively showed that Mr. Wasey committed suicide.

The plaintiff contended that the facts justified the inference that deceased went into the river for the purpose of escaping from confinement, and evidently the jury so found.   We are not able to say that this theory is wholly unsupported by the evidence in the case.   The testimony tending, as it did, to show the strong desire of Mr. Wasey to escape from his confinement, when taken in connection with the circumstances of his death, leaves the case open to the inference that he was attempting to escape by swimming the Flint river.   Whether this theory was as well supported as that of suicide was a question for the jury.

2. Mr. Wasey was placed in the charge of Fred R. Armstrong by Dr. Burr, and when he was a witness on the stand he was asked what Dr. Burr said to him when he placed Mr. Wasey in his charge.   We think it unnecessary to determine whether this testimony was admissible, as the only purpose for which it was admissible was to show the facts that Mr. Wasey was suffering from *melancholia agitata*, and that this species of insanity is usually attended with suicidal tendencies.   These facts appeared by undisputed testimony.   We think, therefore, that it was not prejudicial error to exclude this testimony.

3. Mr. Davock, acting for plaintiff, applied to the agent of the company for blanks upon which to make proofs of loss.   Proofs were made up, consisting of affidavits (1) of an acquaintance of the deceased to his identity, (2) of the undertaker, (3) of the clergyman, (4) of the beneficiary to the age of the deceased, (5) of the beneficiary to her claim, (6) of Mr. M. J. Murphy to the movements of the deceased while insured, and (7) of Mr. Murphy, as a friend of the deceased, that Mr. Wasey came to his death by drowning in the Flint river, Mich. These were all on one sheet of paper.   In addition to these papers, there was forwarded to the company an affidavit made by Dr. Burr, in which he stated, among other things, that "in consequence of *melancholia* there developed delusions of unworthiness and apprehension,

which led to suicide; he drowned himself in the Flint river;" that "the act of suicide had not been caused by any pernicious habit;" and that "a coroner's inquest had been held, which established the fact that death was the result of suicide in consequence of insanity." The court excluded the statements in the affidavit of Dr. Burr above quoted, but offered to receive the other statements of the affidavit. Another ruling, closely allied to this, occurred as follows: Mr. Wasey carried other insurance. In the proofs of loss furnished by plaintiff to other companies she made the statement that Mr. Wasey came to his death by committing suicide. The trial court instructed the jury as follows:

" In considering the testimony that the plaintiff, in proofs of her husband's death made to other insurance companies, stated that he had come to his death by committing suicide, you must consider whether she had any knowledge upon the subject, and, if you find that she had not, you cannot further regard such testimony."

These two rulings may be considered together, and, as will be observed, they present the question whether an admission of a fact is rendered incompetent, and is to be withheld from the jury, or withdrawn from the jury, when it appears that the party who makes the admission has no personal knowledge of the fact. This question arose in *Kitchen* v. *Robbins*, 29 Ga. 713. The question was stated and answered as follows:

"Are no admissions good against a party unless founded on his personal knowledge? The admissions would not be made except on evidence which satisfies the party who is making them against his own interest that they are true, and that is evidence to the jury that they are true. Admissions do not come in on the ground that the party making them is speaking from his personal knowledge, but upon the ground that a party will not make admissions against himself unless they are true. The fact that he makes them against his interest can be reasonably explained only on the supposition that he is constrained to do so by the force of the evidence. The source from which a knowledge of the facts is derived is a circum-

stance for the jury to consider in estimating the value of the evidence, but that is all."

A like question was presented in *Sparr* v. *Wellman*, 11 Mo. 230.   The court said:

"An admission is the statement of a fact against the interest of the party making it; but it is not essential, to constitute it an admission, that the fact should have come under the personal observation of the declarant.   Undoubtedly, admissions of the latter kind are much stronger than where the declaration is of a fact of which the party could have no personal knowledge.   But, where a party believes a fact upon evidence sufficient to convince him of its existence, his declaration of the existence of that fact, if against his interest, is evidence against him.   It is, no doubt, evidence of a very unsatisfactory character, depending altogether on the circumstances under which it is made; but it is competent."

The particular facts of that case, and the deductions from them, are still more in point.   The statement by the court and its direct ruling was as follows:

"Sparr was an innkeeper, and Wellman was his guest. A robbery was alleged, and the innkeeper himself, in this conversation with Crenshaw,   *   *   *   speaks of it as a fact, without qualification.   Might it not be inferred from the relation of the parties that the innkeeper, upon hearing such a report, would feel sufficient solicitude for the credit of his house to make the necessary inquiries, and satisfy himself of the truth of the reported robbery, before he would contribute to its promulgation through the columns of a daily newspaper?   If he had made such inquiries, and became convinced of the truth of the report, he was then stating as fact what he had not only heard, but believed."

In *Chapman* v. *Railway Co.*, 26 Wis. 303 (7 Am. Rep. 81), it was said by Dixon, C. J.:

"It is not necessary that admissions, to be received in evidence, should be as of facts within the knowledge of the party making them.   They may be made upon information derived from others, and still be given in evidence against the party."

The same doctrine was declared by the same learned justice in *Shaddock* v. *Town of Clifton*, 22 Wis. 118 (94 Am. Dec. 588).

The instructions given in this case were not in harmony with those authorities. That the entire proofs of loss were admissible, as in the nature of an admission, see *New York Central Ins. Co.* v. *Watson*, 23 Mich. 486; *John Hancock Mut. Life Ins. Co.* v. *Dick*, 117 Mich. 518 (76 N. W. 9); *Insurance Co.* v. *Newton*, 22 Wall. 32.

Counsel for plaintiff cite *Insurance Co.* v. *Higginbotham*, 95 U. S. 380. In that case it appeared that the plaintiff accompanied her proofs of loss with an affidavit made by Dr. White, in which he stated that deceased had been ill about five months prior to his death, which occurred on the 22d of January, 1871. The court pointed out that the bodily health of the insured on the 1st of October, 1870, was satisfactory to the company, and that the attempt of the company was to show an unfavorable alteration between that date and the 14th of the same month. It appeared that White had not seen him during that period. It was held that a ruling excluding this statement of the affidavit could not have worked legal injury to the company. The court say:

"Whether the presentation of the affidavit of White by Mrs. Day made its contents evidence, whether she knew its contents or not, whether she did or did not adopt or procure it, was not of the slightest consequence. The paper contained nothing that was legal evidence upon the point in issue, and a verdict founded upon it could not have been sustained."

The inference is that as the company, by its physician, had been satisfied of the condition of the insured on the 1st of October, the statement that insured's illness began at an earlier date did not tend to prove that there had been an unfavorable alteration in his condition after the 1st of October and before the 14th. The case of *Insurance Co.* v. *Newton*, 22 Wall. 32, is expressly approved.

4. The next question presented is whether the verdict of the coroner's jury was admissible as original evidence of the fact that Mr. Wasey committed suicide. This question has never before been presented to this court in the form in which it arises on this record, and is an important one. There are authorities sustaining the admissibility of such records at the common law. The most elaborate modern case on the subject is *United States Life Ins. Co.* v. *Vocke*, 129 Ill. 557 (22 N. E. 467, 6 L. R. A. 65), in which the authorities are collected. The most satisfactory reason assigned for receiving such records is that it is a determination of a judicial nature, and analogous to a proceeding *in rem.* 1 Greenl. Ev. § 556. By the ancient law, such high credit was given to a coroner's inquest that the judge would not receive a verdict acquitting a person of the death of a man found against the accused by the coroner's inquest, unless the jury finding such acquittal had also found what other person did the act, or by what other means the party came to his death. 2 Bac. Abr. 431, tit. "Coroners." This rule does not now obtain anywhere, and the natural inquiry is, What remnants of it ought to continue?

The inquiry into the cause of death cannot, under our law, in and of itself establish the *status* of any one or of any property. So it is provided that a record is to be transmitted to the circuit court only in case the jury find that murder, manslaughter, or assault has been committed upon the deceased. 3 Comp. Laws 1897, § 11826. Action based upon the finding is, in such case, authorized, but not in any other case. At the ancient common law, when the jury found that a person had committed suicide, ignominious burial followed. To this extent the inquest established the *status* of the deceased; but, under our practice, nothing follows upon the verdict except in case it is found that a crime has been committed. Why, then, should a stranger to the proceeding be bound by the verdict? Why should it be evidence against a stranger of the cause of his death? We cannot see any well-

grounded reason why such a verdict should be either conclusive or evidence against a stranger to the proceeding. The case of *United States Life Ins. Co.* v. *Vocke*, 129 Ill. 557 (22 N. E. 467, 6 L. R. A. 65), sustains the contention of appellant, but we do not approve of the reasoning of the court or the conclusion reached. See *Mutual Life Ins. Co.* v. *Schmidt*, 8 Am. Law Rec. 629, 40 Ohio St. 112.

5. But one other question is likely to arise upon a new trial. The circuit judge charged the jury that there is no presumption of law that a man who is insane will commit suicide, and added, at the suggestion of plaintiff's counsel, "From the law, as I understand it, the presumption is that he did not commit suicide, whether sane or insane." We think that the instruction in this form was likely to mislead the jury. True, the fact of suicide is a fact to be established by the defense; but the evidence in this case shows that Mr. Wasey was insane, and, as stated in the brief of plaintiff's counsel, his insanity was of a nature usually attended with suicidal tendencies. It is to do violence to the facts to say of a man thus afflicted that there is nevertheless a presumption that he did not do the thing which men in his state usually or commonly feel impelled to do. The instruction was error. *Mutual Ben. Life Ins. Co.* v. *Daviess' Ex'r*, 87 Ky. 541, 549 (9 S. W. 812).

For the errors pointed out, the judgment is reversed, and a new trial ordered.

HOOKER, J., concurred with MONTGOMERY, C. J

GRANT, MOORE, and LONG, JJ. We concur in the opinion of our Brother, the Chief Justice, except in his holding to be admissible in evidence that portion of Dr. Burr's affidavit which stated "that a coroner's inquest was held, which established the fact that death was the result of suicide in consequence of insanity." Such statement is pure hearsay, and therefore, in our judgment, incompetent. The distinction between an admission and a statement which is mere hearsay is shown in *Shaddock* v.

*Town of Clifton*, 22 Wis. 116 (94 Am. Dec. 588). And see, also, *Mutual Life Ins. Co.* v. *Schmidt*, 8 Am. Law Rec. 629, 40 Ohio St. 112.