Argued 11 December, 1902; decided 12 January, 1903.

## COX v. ROYAL TRIBE.

[71 Pac. 73.]

42  365
43  336
42  365
44  553

RECORD OF CORONER'S INQUEST AS EVIDENCE.

1. The record of a coroner's inquest is not competent evidence between private parties on the cause of the death of deceased, for, under the constitution and laws of Oregon, the coroner is not a judicial officer, nor has his record any judicial impress.

IDEM—PROOFS OF DEATH—LIFE INSURANCE.

2. Proofs of death furnished by an agent of a benefit or insurance society are not competent evidence as to the cause of death, in an action by the beneficiary against the company, unless sanctioned by such beneficiary.

LIFE INSURANCE—BURDEN OF PROOF ON SUICIDE.

3. An insurance or benefit society defending against a death claim on the ground of suicide has the burden of proof.

LIFE INSURANCE—PRESUMPTION AS TO CAUSE OF DEATH.

4. In actions on life insurance or death benefit policies the presumption is with the claimant that death resulted from natural causes.

SUFFICIENCY OF EVIDENCE.

5. Evidence in an action on a benefit certificate examined, and *held* not to show suicide on the part of the deceased with such convincing clearness as would have warranted the court in directing a verdict for defendant.

INSTRUCTION ON PRESUMPTION AS TO CAUSE OF DEATH.

6. An instruction, in an action on a benefit certificate, relative to the defense of suicide, that, "when a person is found dead from unexplainable causes, the presumption is that his death was natural or accidental," etc., was not objectionable because of the use of the word "unexplainable," though deceased was not found dead from unexplainable causes, it being manifest that the term was employed to define the presumption alluded to.

IDEM.

7. A further instruction that the beneficiary was therefore entitled to recover, "unless the evidence introduced has overcome this presumption, and satisfied you that death was voluntary," was not objectionable because of the word "satisfied," where the court had previously charged that defendant was required to establish suicide to the satisfaction of the jury by a preponderance of the testimony.

IDEM.

8. Where the dead body of insured was found in the water, but no one saw her go in, and it did not appear from the evidence whether she went in of her own accord or otherwise, the court was warranted, in an action on her benefit certificate, in charging that there was a presumption of a natural death.

From Multnomah: MELVIN C. GEORGE, Judge.

This is an action by Dean Cox, a minor, by J. P. Finley, her next friend, against the Royal Tribe of Joseph to recover upon a beneficiary certificate for $2,000, issued by the defendant to

Capitola Blanche Cox, a married woman, in favor of the plaintiff, her daughter. Immediately prior to the death of Mrs. Cox, which occurred July 1, 1899, she was engaged in conducting a restaurant at No. 206 Madison Street, between First and Front, in the City of Portland. She had been engaged in the business some six weeks or more, and lived in a room adjoining or over the restaurant. Early in May she had a severe attack of la grippe, was attended by a physician, and found to be suffering from intense pain in the head, and was at times, as described by the physician, "nearly wild." She apparently recovered from this trouble by the last of the month, except that it left her in a nervous condition. It was her habit to rise at 5 o'clock in the morning, or earlier, and do her marketing. On the evening of June 30th, about 9 o'clock, her daughter, who was making her home with J. P. Finley, some two and a half blocks distant, was with her at the restaurant, and testified that her mother walked part of the way home with her; that she said she did not feel like going, had to stop and rest on the way, and was so tired that the witness requested her to return, which she did; that she was with her mother the second day before her decease, and that she was light-hearted; that shortly before her death she had a slight stroke of paralysis, but that it did not amount to anything; that her financial condition was such that she had to call upon some of her friends for assistance, among whom were Miss Anna Finley and Mrs. Green, the latter living at Hamilton Avenue, South Portland, from whom she borrowed something like $100; that Mrs. Green lived south of where deceased was found, and that she could have conveniently gone that way in going to her place of residence; and that she went to see Mrs. Green frequently, going both in the daytime and the evening. Inez Jenkins testified that she had a rooming house adjoining the restaurant, and that Mrs. Cox roomed with her occasionally; that witness saw her and talked to her about 10 o'clock, after she had retired, on the evening before her death; that she said she had a great deal of trouble in her restaurant, and had just employed a married man and his wife to cook for her; that she spoke of being tired, and

complained of the top of her head hurting her, and said that
when she laid down at night she wrung a towel out of ice water
and put it on her head; that she had been complaining of her
head for about three weeks; that she said she thought her busi-
ness would be prosperous if she only had the means to get
ahead, and remarked that she had but little means with which
to obtain provisions for breakfast; that she left the room about
5 o'clock in the morning; that at one time previous witness
heard her say she had a notion to take a revolver and blow out
her brains, but laughed when she said it, and witness thought
little about the incident; that she was in the habit of carrying
a revolver for self-protection, and, as a rule, she went in the
morning to Duffy's market, on the corner of Front and Madi-
son; that on the morning in question the meat was sent over to
the restaurant, and that witness found her purse, after her
death, at the restaurant, with a little money in it.

It is further shown that at 7:15 o'clock in the morning of
July 1st her body was found floating in an eddy of the river
at the foot of Mead Street about a mile south of her place of
business. The river was high, and at the place referred to the
water was from four to eight or ten feet deep. It was near the
railroad track, along which the old macadamized road ran,
which was usually traveled by persons going to and from parts
of South Portland. When first seen, her body was ten or fifteen
feet from shore, face upward, and her hair loose, and gathered
about her face. On the shore, and within a few feet of the
water's edge, was found her straw hat, underneath which were
deposited her pistol and a note in her handwriting, written
with a lead pencil on yellow paper, containing these words and
figures, "Mrs. Cox, 206 Madison Street," and near by was her
cape or cloak. The margin of the river, from the road down to
the water, was covered with grass, and the track of a woman
heading toward the stream was found at the water's edge,
partly covered by the water. Her two account books, tied
together with a string, which she was in the habit of carrying
with her when marketing, were found in the water near the
shore, and the paper upon which the note was written was ap-

parently taken from one of these books. Examination of the body disclosed that the lungs were free from water; that sand was contained in her nostrils, that her lips were of a violet color, and that there were no bruises upon the body, or any indication of violence. Dr. Candiani, the physician who examined her at the morgue during the coroner's inquest, testified that the indications showed that she died from asphyxiation,— that is to say, on being submerged she closed her mouth, thereby excluding water from the lungs, resulting in asphyxiation; and that the body had the appearance of having been in the water a short time only,—from two to four or five hours. Mrs. Cox was about thirty-seven years of age, stout build, weighing 185 pounds and upward. The jury were taken to view the place where her body was found. During the course of the trial the record of the coroner's inquest was offered in evidence by the defendant for the purpose of showing that death was the result of suicide, there being a clause in the policy voiding it if death was so occasioned, and, upon objections interposed thereto, it was rejected by the court. The defendant also offered in evidence proofs of Mrs. Cox's death, submitted by J. H. Bridgeford, scribe of the local lodge, to the Supreme Executive Council, with a copy of the coroner's record attached thereto, whereupon objection was again made to the introduction of such record, but not as to the other proofs, and, defendant's counsel being unwilling to segregate it therefrom, the whole was rejected. At the close of plaintiff's case, and again at the close of the testimony, the defendant moved for a nonsuit, which motion was in each instance denied. Defendant also requested the court to direct the jury to find a verdict for defendant. This was also refused, and, the verdict and judgment being for plaintiff, the defendant appeals.          AFFIRMED.

For appellant there was a brief over the names of *Harry B. Walker* and *William D. Fenton* (*Rufus A. Leiter*, counsel), with an oral argument by *Mr. Fenton* and *Mr. Leiter*.

For respondent there was a brief over the names of *Arthur C. Spencer* and *Chamberlain & Thomas*, with an oral argument by *Mr. Spencer* and *Mr. Warren E. Thomas*.

Mr. Justice Wolverton, after stating the facts, delivered the opinion of the court.

1. The first question of vital importance presented is respecting the admissibility of the record of the coroner's inquisition *super visum corporis* as independent evidence to show the fact of suicide. The contention of counsel is that defendant was entitled to have it go to the jury, not as conclusive evidence of the fact, but along with the other evidence bearing upon the subject, for their consideration. Anciently, the office of coroner was of great dignity, and exercised by persons of high authority, as well as by those in lesser degree and station. Blackstone says: ''There are also particular coroners for every county of England, usually four, but sometimes six, and sometimes fewer. This office is of equal antiquity with the sheriff, and was ordained together with him to keep the peace when the earls gave up the wardship of the county. He is still chosen by all the freeholders in the county court'': 1 Bl. Com. *347. As ascertained in great measure from the statute (4 Edw. I., *de officio coronatoris*), the powers and duties of the coroner are both judicial and ministerial, his judicial authority extending to inquiries touching the manner of death of any person slain, or dying suddenly or in prison, which must be *super visum corporis;* and also to inquiries respecting treasure trove and shipwreck. His ministerial office is only as the sheriff's substitute: 1 Bl. Com. *349; 2 Bac. Abr. 428. A coroner's court in England is a court of record, and upon a finding of *felo de se* the executor or administrator may remove the inquest of office into the court of the king's bench, and traverse it; for it is said: ''It would be hard that he should be concluded by an inquisition, which is nothing more than an inquest of office, taken behind his back'': Starkie, Ev. (10 ed.) *404; 7 Am. & Eng. Enc. Law (2 ed.), 604; 1 Hale, P. C. 416, 417; *Garnett v. Ferrand*, 6 Barn. & C. 611. In the United States they are generally denominated courts of inferior jurisdiction, and not of record: 7 Am. & Eng. Enc. Law (2 ed.), 604; but in this state the organic act does not so much as dignify the office with any judicial functions whatever: Const. Or. Art. VI, § 6; Art.

42 Or.—24

VII, §§ 1, 9. In the case of a *felo de se,* under the old law his goods and chattels were forfeited to the king, and his body was given over to an ignominious burial, these resultant features giving the inquisition the semblance of an action *in rem,* which determined the status both of the person of the deceased and of his goods and chattels. So it has come to be held in England that inquisitions *post-mortem* are admissible as evidence of the status, but not conclusive: *Sergeson* v. *Sealey,* 2 Atk. 412; Starkie, Ev. (10 ed.) *406; 1 Greenleaf, Ev. (15 ed.) § 556. A like rule has been promulgated in some of the states of the Union, based upon the reasoning that gave rise to it in the country of its nativity: *United States Life Ins. Co.* v. *Vocke,* 129 Ill. 557 (22 N. E. 467, 6 L. R. A. 65) ; *Pyle* v. *Pyle,* 158 Ill. 289 (41 N. E. 999) ; *Grand Lodge* v. *Wieting,* 168 Ill. 408 (48 N. E. 59, 61 Am. St. Rep. 123) ; *Supreme Lodge* v. *Fletcher,* 78 Miss. 377 (28 South. 872, 29 South. 523) ; *Metzradt* v. *Modern Brotherhood,* 112 Iowa, 522 (84 N. W. 498).

The leading case is perhaps the first cited,—*United States Life Ins. Co.* v. *Vocke,* 129 Ill. 557 (6 L. R. A. 65, 22 N. E. 467),—which bases the rule, not upon the ground that the coroner acts in a judicial capacity, for the organic act of the State of Illinois deprived him of any such power, but for the reason that the inquisition is made by a public officer, acting under the sanction of an official oath in the discharge of a public duty enjoined upon him, and returned to and filed in the office of the clerk of the circuit court, as required by law; Mr. Justice Baker, in his concurring opinion, affirming that such an inquisition thereby became a record of the circuit court, and as such is competent as testimony. This authority is apt under our constitution as well, in so far as it discards the idea that a coroner's inquest is judicial in character. Under our statute the coroner has power, when informed that a person has been killed or dangerously wounded by another, or has suddenly died under such circumstances as to afford a reasonable ground to suspect that his death has been occasioned by criminal means, or has committed suicide, to inquire, by the intervention of a jury, into the cause of the death or wound, and to perform the

other duties incidental thereto in the manner prescribed by statute: B. & C. Comp. § 1045. His duty requires him to go to the place where the dead or wounded person is, and summon six qualified persons to serve as jurors; whose duty it becomes, on being sworn, to inquire who the person was, and when, where, and by what means he came to his death or was wounded, as the case may be, and into the circumstances attending the death or wounding, and give a true verdict therein according to the evidence offered or arising from the inspection of the body. He must subpœna and examine as witnesses every person who, in his opinion, has knowledge of the material facts; also a surgeon or physician, who must inspect the body, and give a professional opinion as to the cause of death or wound; and, for the purpose of compelling such witnesses to attend and testify, or punishing them for disobedience, he is to be deemed a magistrate. The testimony of the witnesses and the verdict must be reduced to writing. If the jury find that a crime has been committed, the coroner must forthwith deliver the testimony and verdict to a magistrate; but, of they do not so find, he must return the same to the clerk of the county court; and, if the verdict also charge a person with the commission of the crime, the magistrate is immediately to issue a warrant for the arrest of such person as on an information, and, when brought before him, to examine into the charge contained in the verdict: B. & C. Comp. §§ 1683 to 1690, inclusive. According to this procedure, if the jury do not find that a crime has been committed, the testimony and verdict must be returned to the clerk of the county court, which, under the constitution, is a court of record. This would perhaps include a verdict that death was self-inflicted, so that we have almost a parallel with the Illinois case.

However, it seems to us that that case and those that follow it proceed upon an erroneous principle. Such a document, before it can be admissible under any of the older authorities, must be judicial in character, and we cannot think that the mere fact that it is required to be returned to and filed with the clerk of a court of record endows it with that vitality. Mr.

Starkie's classification of judicial documents is: (1) Judgments, decrees, and verdicts, and (2) inquisitions, depositions, and examinations taken in the course of a judicial proceeding. A third includes writs, warrants, pleadings, etc. Of inquisitions he then says: "Such inquests as are of a public nature, and taken under competent authority, to ascertain a matter of public interest, are, upon principles already announced, admissible in evidence against all the world. They are very analogous to adjudications *in rem*, being made on behalf of the public. No one is properly a stranger to them, and all who can be affected by them usually have the power of contesting them": Starkie, Ev. (10 ed.) *316, 403, 404. We have seen that when suicide was involved it was susceptible of traverse under the English system in the court of the king's bench, and had legitimate sanction of a judicial proceeding in every stage of its progress and development; and Greenleaf does not announce a different doctrine. Now, it cannot be said that a coroner's inquest under our system has the sanction or is taken in the course of any judicial proceeding; much less that it is of judicial impress. The verdict of the jury, if no crime is found to have been committed, is merely returned into a court of record, with no power of revision or approval. If a crime has been committed, and a person is charged therewith, the verdict serves as an information, upon which a magistrate may issue a warrant of arrest, and examine him touching the charge; but the inquisition has no probative value in that proceeding even, so that it is wholly extrajudicial, and, within itself, is void of all the essential qualities that go to make it independent evidence of homicide, self-inflicted. This view is supported by abundant authority, and we believe ·it to be founded upon correct legal principles: *Germania Life Ins. Co.* v. *Ross-Lewin,* 24 Colo. 43 (51 Pac. 488, 65 Am. St. Rep. 215); *Wasey* v. *Travellers' Ins. Co.* 126 Mich. 119 (85 N. W. 459); *State, to use,* v. *Cecil County Com'rs,* 54 Md. 426; *Union Cent. Life Ins. Co.* v. *Hollowell,* 14 Ind. App. 611 (43 N. E. 277); *In re Ralston,* 9 Pa. Dist. R. 514. The record of the inquest was, therefore, properly rejected.

2. The next question relates to the refusal to admit in evidence the proofs of death as a whole, which is assigned as error. A by-law of the defendant provides that upon the death of the assured the lodge of which he was a member shall at once notify the Supreme Executive Council, giving the name of the deceased member, the number of his certificate, and shall furnish upon blanks provided for that purpose full and satisfactory proofs of death. The blank forms furnished by the supreme lodge require that in case of a voluntary or mysterious death a duly authenticated copy of the coroner's inquest, under his hand, must accompany the proofs. It is undoubtedly a well established rule of law that the record of a coroner's inquest attached to proofs of death made by the beneficiary or his agent, in conformity to blanks furnished by the company, is admissible in evidence, along with such proofs, upon the ground that it contains admissions of the beneficiary against his interest as to the cause of death: *Insurance Co.* v. *Newton,* 89 U. S. (22 Wall.) 32; *Insurance Co.* v. *Higginbotham,* 95 U. S. 380; *Keels* v. *Mutual R. F. Life Assoc.* 29 Fed. 198; *Sharland* v. *Washington Life Ins. Co.* 101 Fed. 206 (41 C. C. A. 307); *Hart* v. *Fraternal Alliance,* 108 Wis. 490 (84 N. W. 851); *Walther* v. *Mutual Life Ins. Co.* 65 Cal. 417 (4 Pac. 413.) But the rule can have no application where such proofs are furnished by the company's agent. When thus furnished, nothing contained therein, unless subscribed by the beneficiary or his agent, or at least with his express or implied sanction, can operate as an admission on his part, and against his interest. Such declarations, from their very nature, must necessarily be self-serving, and could hardly fail to be conducive of abuse or injustice. By section 127 of the by-laws of the order, it is made the duty of the subordinate lodge of which the deceased was a member to notify the Supreme Executive Council of his death in the manner therein designated, and no duty seems to have been cast upon the claimant to furnish proofs of death as a prerequisite to maintain an action upon the certificate. The subordinate lodge is thereby made the agent of the executive council, for whom it acts in furnishing

proofs of death, and not for the claimant: *Anderson* v. *Supreme Council,* 135 N. Y. 107 (31 N. E. 1092) ; *Supreme Council* v. *Boyle,* 10 Ind. App. 301 (37 N. E. 1105). The death of Mrs. Cox being admitted, the object of introducing such proofs in behalf of the defendant was solely to show the manner of her death, it having been alleged as a defense that it was the result of her own act. As we have seen, the record of the coroner's inquest is not legitimate evidence for that purpose, and it is not rendered admissible because it is sought to be introduced along with the other proofs of death made up by the agent of the defendant, and could in no way bind the plaintiff as an admission touching the manner of death. The record was therefore, not proper for the consideration of the jury, although it constituted a part of the proofs; there being no controversy as to the fact of death: *Royal Arcanum* v. *Brashears,* 89 Md. 624 (43 Atl. 866, 73 Am. St. Rep. 244).

3. It is further insisted that a nonsuit should have been granted upon defendant's motion therefor, or that the court should have directed a verdict in favor of the defendant, as requested. As to this we are clearly of the opinion that there was sufficient evidence adduced to justify the court in letting the case go to the jury. The burden of proof was with the defendant to establish suicide, and this it has not done by such clear and convincing evidence, void of dispute and controversy, as to warrant the court in directing a verdict in its favor.

4. There is a presumption that death is the result of natural causes, which inures to the benefit of the plaintiff, and should, as the first step, be satisfactorily overcome before the defendant could have a verdict.

5. Again, the defendant is called upon to counterbalance by such cogent and convincing proofs any testimony adduced tending to establish death from natural causes that there could not reasonably be two opinions touching the result; for, if it were otherwise, it would be an invasion of the province of the jury to take the case from them. The question here, then, is the one stated by the court in the case of *Sovereign Camp* v. *Haller,* 24 Ind. App. 108 (56 N. E. 255) : Are the facts proven

such as to exclude any other reasonable inference than that the assured voluntarily took her own life? And this we must answer in the negative. For cases of marked analogy supporting this view, see *Beckett* v. *Northwestern M. A. Assoc.* 67 Minn. 298 (69 N. W. 923); *Royal Arcanum* v. *Brashears*, 89 Md. 624 (73 Am. St. Rep. 244, 43 Atl. 866); *Goldschmidt* v. *Mutual Life Ins. Co.* 12 N. Y. Supp. 866; *Travellers' Ins. Co.* v. *Nitterhouse*, 11 Ind. App. 155 (38 N. E. 1110); *Stephenson* v. *Bankers' Life Assoc.* 108 Iowa, 637 (79 N. W. 459); *Metzradt* v. *Modern Brotherhood*, 112 Iowa, 522 (84 N. W. 498); *Home Ben. Assoc.* v. *Sargent*, 142 U. S. 691 (12 Sup. Ct. 332); *Ingersoll* v. *Knights of Golden Rule* (C. C.) 47 Fed. 272. It cannot be said that the evidence introduced has but one tendency, and that pointing to self-destruction by the deceased. It is somewhat in conflict, to say the least, and different minds may reasonably come to different conclusions as to whether the act was her own, whether sane or insane, or whether it was the result of apoplexy or sudden sickness, causing her to fall into the water where she was found.

6. The court instructed the jury, among other things, as follows: "One of the defenses in this case is that the deceased, Capitola Blanche Cox, committed suicide, and you are instructed that this is an affirmative defense set up by defendant, and the burden is upon the defendant to establish same to your satisfaction by a preponderance of the testimony. When a person is found dead from unexplainable causes, the presumption is that his death was natural or accidental, if nothing appears to the contrary. Self-destruction is contrary to the general conduct of mankind. The plaintiff is therefore entitled to recover, unless the evidence introduced has overcome this presumption, and satisfied you that death was voluntary. The presumption of law is, in the absence of any evidence as to the cause of death, that it happened from natural causes, and that such death did not arise from self-destruction; and in this case, if there was no proof as to the cause or manner of death of Mrs. Cox, or if the evidence as to whether her death was caused by accident or natural causes, and not by her own hands, was

evenly balanced, you would find in favor of this presumption. But this is only a disputable presumption, and if, from all the evidence in the case, you find by the preponderance thereof that she came to her death by her own hands, whether she was sane or insane, you must find for defendant." Exception was taken to this instruction on account of the use of the words "unexplainable" and "satisfied." It is suggested that Mrs. Cox was not found dead from unexplainable causes; but it is manifest the term was employed by the trial court to define the presumption alluded to, and it was left to the jury to say whethere there was any proof as to the cause or manner of her death.

7. It is also suggested that the term "satisfied" is a much stronger one than should have been employed in that relation, signifying, as it does, to settle certainly, or fix permanently, what was before uncertain, doubtful, or disputed. It must be construed, however, in the sense in which it was used. The court explained previously that the burden of proof as to the fact of suicide, if it existed, was with the defendant, and this it must establish to the satisfaction of the jury by a preponderance of the testimony. To be "satisfied" by a preponderance of the evidence and to be "satisfied" in the general sense are entirely different conditions of the mind, and the term was, as clearly indicated by the court, employed in the former sense.

8. But the more serious objection seems to be that the court should not have instructed at all as to the presumption of death from natural causes, affirming that there was sufficient testimony otherwise bearing on the issue from which the jury should have made up their verdict; and citing *Sackberger* v. *National Grand Lodge,* 73 Mo. App. 38. In the case at bar the evidence is not such as to explain or to indicate with such probability how the body of the deceased came to be in the water as found as to render the presumption unavailable in determining the cause of death. She was found in the water, but no one saw her go in, and how she came to be there—whether of her own accord or by another cause—no one can positively say from the testimony; hence the presumption be-

comes a pertinent factor in determining the cause, and, we think, was properly submitted to the jury in aid of their deliberations. The instruction is in accord with Rule 120, Lawson, Presump. Ev. 576, and has the support of *Graves* v. *Colwell,* 90 Ill. 612. These considerations affirm the judgment of the trial court, and such is the order of this court.     AFFIRMED.

Decided 12 January; rehearing denied 30 March, 1903.